UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-10145
_____


STEPHANIE WALKER; NYREE PRESTON,

                              Plaintiffs-Appellants,

                    versus

CHERYL THOMPSON; DON KINGSTON;
GLASFLOSS INDUSTRIES, INC.,

                              Defendants-Appellees.

_____

Appeal from the United States District Court for the
                Northern District of Texas
_____
                    June 13, 2000

Before JOLLY, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

     This appeal is from a district court's grant of summary

judgment in favor of an employer in a race discrimination case.  We

conclude that the district court properly granted summary judgment

with respect to the appellants' claims of failure to promote,

retaliation, and intentional infliction of emotional distress and,

thus, affirm in part.  However, after a thorough review of the

record, we are convinced that the appellants have raised a genuine

issue of material fact regarding their claim of hostile work

environment.  We therefore vacate the district court's grant of summary judgment on that claim and remand for further proceedings.

I.  FACTUAL AND PROCEDURAL HISTORY

Because this case is before us on appeal from a summary judgment, we set forth the evidence in the light most favorable to the appellants.  Glasfloss Industries, Inc. (Glasfloss), a closely held Texas corporation with facilities in Dallas and Houston, manufactures and sells air filtration products.  Scott Lange (Lange), who resides in Wisconsin,[1] is president of Glasfloss.  Don Kingston (Kingston) is vice-president and general manager, and Cheryl Thompson (Thompson) holds the position of office manager.

In January of 1994, Thompson hired Stephanie Walker (Walker), an African-American woman, as an accounts-receivable clerk.  Thompson was Walker's immediate supervisor.  The next month, during a conversation on the topic of babysitting, Thompson told Walker that her grandmother would rub a little black boy's head for good luck much like the slave masters did to slaves.[2]  Walker responded that "it wasn't funny" and that she "hadn't [ever] heard anything like that before."

---

[1]    Lange is president of two other related Glasfloss companies, Glasfloss Industries, Inc. (which is incorporated in Wisconsin) and Glasfloss Industries, Inc. of Ohio.  Lange is also the general manager of Glasfloss in Wisconsin.

[2]    During her deposition, Thompson admitted to making this remark to Walker; however, she asserts that it was in the context of explaining that her grandmother had never been around African-Americans.

Approximately a month later, Bill McKnight (McKnight), the operations manager at Glasfloss, asked Walker "where she was from [sic]." She replied Africa. McKnight laughed and retorted that Walker did not look like she swung from the trees. Thompson was present when McKnight made that remark. The next day, Thompson's husband was at the office and inquired of Walker "where did you say you were from, your people was [sic] from?" Walker again responded Africa, and Thompson's husband said "I thought you looked like one of my grandmother's slaves." Thompson and her husband laughed.

Late in 1994, Thompson hired Barbara Scoggins, a Caucasian woman, for a position in the payroll department. In March of 1995, Thompson mentioned to Walker that a customer service supervisor position was being created. Walker informed Thompson that she would be interested in such a position, and Thompson responded that "nothing is official right now. . . . [W]e'll let everybody know." Walker did not hear anything else about the position until it was announced that Thompson had promoted Scoggins to the position of customer service supervisor.

In April or May of 1995, a data entry position became available. Walker again expressed interest to Thompson. According to Walker, a white woman named Karen was hired to fill the data entry position, a position Walker believed would be a functional promotion. Walker later complained to Bert Hibl, who was the sales manager, that she would never be promoted because of the prejudice in the office. Hibl responded "you're probably right."

3

In the context of discussing the collection of accounts for a customer, Mark Filewood, marketing and product development manager, told Walker he would send her back to Africa with her family if she was not careful. Filewood made this "threat" once during the summer of 1995, and again several months later.

On one occasion there were Brazilian nuts in the office, and Thompson asked Walker whether she knew what they were called. Thompson informed her that some people called them "nigger toes."

Scoggins hired Nyree Preston (Preston), an African-American woman, for the position of customer service representative in March of 1996. Subsequently, Scoggins hired Denise Porter (Porter), an African-American woman, for a position in the customer service department. Scoggins was the immediate supervisor for both Preston and Porter, and Scoggins reported to Thompson.

In the spring of 1996, Amy Langsford (Langsford), an employee at Glasfloss, was upset that her estranged husband would not return her young son's tennis shoes. In Walker's presence, a crying Langsford exclaimed that her husband wanted to hang the shoes from his rear view mirror "like those niggers." Upon hearing this, Scoggins burst into laughter, and Langsford apologized to Walker.[3]

During a conversation with Walker, Thompson indicated that any race was acceptable except African-Americans. Thompson stated that Matilda Faz (Faz), an Hispanic Glasfloss employee, was "still white

---

[3] During her deposition, Scoggins testified that she heard Langsford make the remark about the tennis shoes.

as long as she wasn't black." At a subsequent time, McKnight observed that Juby, an Indian Glasfloss employee, was as dark complected as Walker. Thompson explained that Juby was acceptable because his hair was different from the hair of black people.

At various other times, the managers at Glasfloss made several offensive remarks regarding African-American hair. In Walker's presence, McKnight, for no apparent reason, began talking about a cat that had "nappy" hair like "black people." Walker asked McKnight if he was trying to make a point, and McKnight did not respond. At a different time, Scoggins was planning to hold some sort of beauty demonstration and asked Walker if she could "do" Walker's hair. Scoggins said "[a]fter all, I do [my dog's] hair." Walker refused. One other time, while in the break room, Walker overheard Thompson tell Faz to ask Walker about what she did with her hair when it got wet and "nappy." Faz complied with Thompson's request, but Walker did not respond.

As Walker was leaving a Glasfloss anniversary party held at a local establishment, McKnight "yelled out that [she] needed to hurry up and get to [her] car." When Walker asked him why, he blurted out "because somebody would think [she] was there to rob them." Everyone there, including Kingston, laughed.

For Thompson's 30th birthday in June of 1996, she received a birthday card from another employee with a photographic likeness of a monkey on the face of the card. The card itself, commercially produced by American Greetings, contained an innocuous birthday

5

message.[4]  Thompson claims that she displayed it on her desk among other birthday cards.  Contrary to Thompson's assertion, Walker and Preston contend that the card was not among the others on Thompson's desk but instead was the lone card taped to Thompson's window with the picture of the monkey facing the desks of the African-American employees.  During the month that this card was on display, Thompson, Scoggins, and McKnight would view the card in relation to its position vis-a-vis the three African-Americans, laugh, and make jokes about the "little black monkey."

It was around this time that Scoggins decided to move Porter to a desk away from Preston's desk in order to keep them from talking.  Scoggins separated the two African-American employees despite Preston's protest that she was supposed to be training Porter.  Additionally, Scoggins stated to Preston that she had a personal problem with her conversing with Walker, and that although she could not control Walker because Walker was not in her department, she could control Preston and Porter, who worked under her.

At one point, Porter took one day of personal leave but needed to call the office regarding work.  When she called and asked to speak to Preston, the receptionist "screamed out" that Preston had a "personal call."  This upset Porter because the call was work-

---

[4]  The printed message inside the card read as follows: "After awhile birthdays can get pretty hairy!  Have a good one!"  There was also a handwritten message to Thompson from an employee at Glasfloss, which simply was an expression of good will.

related and there had been recent instructions to limit personal calls. When Porter returned to Glasfloss the next day she addressed her complaint to the receptionist. Scoggins reproached her for doing so even though previously management had instructed the employees to attempt to resolve their problems with co-workers prior to resorting to making a complaint to management.[5]

As a result of her encounter with Scoggins, Porter became very upset. After attempting to regain her composure in the restroom, she returned to the office. Walker apparently noticed some lint from a facial tissue in Porter's braided hair and began removing it. While Walker was doing so, Kingston walked by and said "What are you doing [Walker], picking fleas?"

Sometime during the latter part of 1996, Sandra, an employee in the Glasfloss human resources department, told Walker and Preston that Thompson instructed the receptionist to listen to Walker's and Preston's phone conversations. Also, Diane Cantu, another human resources employee, stated that Thompson instructed her "to act a certain way towards" Walker, Preston, and Porter.

In December of 1996, Preston had a question regarding the computer system and Walker, who was on a break, walked up to assist her. Upon seeing the two women talking, Thompson inquired whether Walker had any work to do. Walker replied that she was on a break

---

[5] Porter had observed white employees directly address problems with other departments and co-workers; however, it appeared that African-Americans were forced to address all their complaints through their supervisors, Thompson or Scoggins.

7

and helping Preston with a work-related question. Thompson countered that regardless of what they were discussing, they should not be talking. Walker expressly inquired of Thompson "[a]re you saying that the black ladies shouldn't be talking?" Thompson angrily responded "[t]hat's exactly what I'm saying." Further, around this same time, Thompson asserted that Kingston did not want Walker, Porter, and Preston talking to one another. Thompson would enforce this "policy" by standing with her hands on her hips and staring at these women whenever she caught them talking.

That same month Walker contacted an attorney named Judith Gregg regarding the racial discrimination and harassment she perceived at Glasfloss. On January 8, 1997, Gregg sent Lange a letter that summarized Walker's complaints, including some of the above-described incidents, and made clear that Walker did not want to resign or take legal action but instead wanted the illegal conduct to cease. Lange promptly responded in writing to Gregg indicating that Glasfloss did not condone discrimination and that he had authorized Kingston to take immediate action and investigate the allegations.

As a result of the investigation, Kingston gave Thompson a written warning for her lack of self control and diplomacy in regard to the time she snapped at Walker and Preston for talking to each other. Kingston concluded, however, that there was no racial discrimination or harassment in the office environment at

Glasfloss.[6]

Sometime in early 1997, Walker observed two African-American men attempting to apply for positions in the warehouse. McKnight informed them Glasfloss was not hiring. Less than an hour later McKnight gave applications for employment to two Hispanic men who requested them. Walker witnessed this on two separate occasions.[7]

After realizing that Kingston did not interview any of the other African-Americans with respect to Walker's complaint of racism, Porter believed Walker's letter to Lange had not accomplished anything. She stated that she resigned because she could no longer tolerate the racism and discrimination at Glasfloss.

On February 26, 1997, Walker and Preston, without the assistance of counsel, filed a notice of charge of discrimination with the Equal Employment Opportunity Commission (EEOC) because they felt the letter had not adequately addressed the racial discrimination at Glasfloss. Moreover, they felt Kingston was biased because (1) he made the "picking fleas" comment; (2) he laughed at McKnight's comment that people would think Walker was there to rob them; and (3) he did not interview the other two

---

[6] Although Kingston concluded that there had been no racial discrimination or harassment, he testified during his deposition that he reprimanded Thompson for making the comment about rubbing the head of a black child for good luck.

[7] McKnight also referred to an apparently homeless black man who was walking near the grounds at Glasfloss as a "black drag queen." McKnight called the police to complain, and eventually the police came and removed him.

African-American employees at the office, Porter and Preston, regarding Walker's complaint.

After the EEOC complaint was filed, Walker and Preston felt that the employees and managers were hostile to them. Kingston began greeting them every morning in a loud, sarcastic manner. When Filewood came to the accounting office with papers, instead of handing her the papers or placing them on Walker's desk, he would throw them on her desk. Occasionally, the papers would land on the floor. Walker complained to Kingston about Filewood's actions, and Filewood later apologized to Walker. Nevertheless, he continued to give Walker hostile looks after the apology.

Preston believed that McKnight would stand by the facsimile machine and stare at her. Preston's chair sat on a plastic strip, and McKnight would step on that strip in order to cause Preston's chair to roll.

McKnight apologized to Walker but at the same time made a request of Walker to "do a rain dance . . . what y'all do." Walker perceived this to be a racist remark.

On March 6, 1997, Thompson instructed Walker to retrieve some paperwork from the warehouse. Walker responded that the warehouse was too cold, and, further, Thompson had previously said the administrative office employees should not go to the warehouse because they were not covered under the insurance policy. After her initial refusal, Walker complied with Thompson's request. Based on this event, Thompson reprimanded Walker with a written

warning.

Preston tape-recorded a conversation she had with Scoggins without Scoggins' knowledge. According to Preston, in that conversation, Scoggins agreed that there was a division between black and white people in the office and that the black people were not treated fairly with respect to the no-talking policy. Scoggins told Preston she was proud of Preston for standing up for her rights. Preston nevertheless believed that Scoggins had discriminated against her.

Walker and Preston and certain representatives of Glasfloss[8] met with the EEOC. The EEOC was satisfied with Glasfloss's cooperation and the proposed agreement.[9] Nevertheless, Walker and

---

[8] The appellants state that Lange, the president, did not attend this meeting.

[9] The proposed agreement provided that the appellants would not institute a lawsuit in exchange for the following:

> a. Respondent agrees that the Company's policy regarding socializing and talking in the work place will apply equally to all employees. The Company policy permits employees to socialize and talk to each other provided such socialization and talk does not unsuitably interrupt others who are working or unsuitably affect employees' productivity. This policy will be put in writing and disseminated to all employees via memorandum no later than 20 days from the date of this Agreement.

> b. Respondent hereby confirms that it has a policy that has been distributed to all employees, including supervisors, managers and officials, against racial harassment, to include racially offensive comments, slurs, jokes, etc. Any violation of the letter or

11

Preston refused to be parties to the agreement because they believed that Kingston was biased against them because of the allegations they made against him.  They believed Lange, the

_____

spirit of this policy by any employee will result in disciplinary action up to and including termination.

c.  Respondent agrees to require all of its managers in the Dallas office to attend diversity/sensitivity training.  This training will be done as soon as practical but no later than 60 days from the date of this Agreement.

d.  Respondent agrees that the Dallas Vice President/General manager will be designated to receive all EEO complaints and that Respondent's managers will not retaliate against any persons filing EEO complaints and will timely and effectively investigate each such complaint.

e.  The parties to this Agreement agree that Respondent will reiterate its policy that all employees should be respectful to other employees, and that all employees are to refrain from conduct that amounts to insubordination.

f.  Respondent agrees to disseminate to all employees a reminder about its policy on overtime pay via memorandum within 20 days from the date of this Agreement.

g.  Respondent agrees to sign and conspicuously post a copy of the "Notice" which is attached to this Agreement.  The notice will be on Commission letterhead and shall remain posted for 30 days from the effective date of this Agreement in Respondent's office . . . .

h.  Respondent agrees that [the appellants] will not be penalized in future considerations for transfers, promotions, wage increases, or other employment related matters . . . .

12

president, was the only person who could resolve the problems, and he had not been involved in the process.

Pursuant to the proposed agreement, Glasfloss subsequently held mandatory diversity/sensitivity training for all managers and office employees. Also, Glasfloss circulated a memo stating that "all employees are free to visit with any co-workers as long as the visiting does not unsuitably interrupt others who are working or unsuitably affect employees' productivity."

During a team meeting the week before Preston resigned, she was seated at the conference table when Brenda Barrett (Barrett), a fellow Glasfloss employee, walked into the room. Thompson asked Barrett what kind of candy she had, and Barret replied that the candy was from the "hood." According to Preston, the "hood" is in South Dallas, and the population is 90% African-American. Barrett then offered Preston a piece of candy but did not offer it to anyone else at the meeting. Preston was the only African-American at the meeting.

On May 13, 1997, Walker[10] and Preston[11] resigned from Glasfloss. Approximately three months later they filed suit in state district court, asserting discrimination claims against Glasfloss, Kingston, and Thompson. The defendants removed the case to federal court.

---

[10] During Walker's tenure at Glasfloss, Thompson gave Walker several good performance reviews that resulted in pay increases. Walker's initial pay rate rose from $7.50 to $9.25 per hour.

[11] Preston received six raises during her employment at Glasfloss and was promoted to lead customer service representative. Her pay increased from $7.50 to $9.65 per hour.

13

The plaintiffs filed an amended complaint alleging race discrimination and retaliation under Title VII, race discrimination under 42 U.S.C. § 1981, and intentional infliction of emotional distress under Texas law. After discovery, the defendants moved for summary judgment on all of the plaintiffs' claims. The district court granted that motion and dismissed the plaintiffs' claims. Walker and Preston now appeal to this Court.

II. ANALYSIS

A. STANDARD OF REVIEW

The appellants appeal the district court's grant of the appellees' motion for summary judgment. This Court evaluates a district court's decision to grant summary judgment by reviewing the record under the same standards the district court applied to determine whether summary judgment was appropriate. *Herrera v. Millsap*, 862 F.2d 1157, 1159 (5th Cir. 1989). Therefore, the summary judgment will be affirmed only when this Court is "convinced, after an independent review of the record, that `there is no genuine issue as to any material fact' and that the movant is entitled to judgment as a matter of law.'" *Id.* (quoting *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.,* 832 F.2d 1358, 1364 (5th Cir. 1987) and Fed.R.Civ.P. 56(c)). Fact questions must be considered with deference to the nonmovant. *Herrera,* 862 F.2d at 1159. Thus, if a fact question is dispositive of a motion for summary judgment, "we must review the facts drawing all inferences most favorable to the party opposing the motion.'"

14

*Id.* (quoting *Brooks,* 832 F.2d at 1364).  Questions of law are reviewed *de novo.*  *Id.*

B.    FAILURE TO PROMOTE UNDER SECTION 1981

Walker argues that the district court erred in granting summary judgment on her failure to promote claims under 42 U.S.C. section 1981.[12]  In the district court, Walker raised failure to promote claims under both Title VII and section 1981.  Walker now appeals only the district court's dismissal of her failure to promote claims under section 1981, arguing that there is no requirement under section 1981 to exhaust administrative remedies.

The appellees respond that the district court did not dismiss the § 1981 claims on the basis of failure to exhaust administrative remedies.  Although the district court's opinion could have been drafted more precisely, a careful reading convinces us that the district court dismissed the § 1981 claims for failure to exhaust and, in the alternative, on the merits.

In the district court's discussion regarding whether Walker had exhausted her administrative remedies by raising her failure to promote claims in the EEOC charge, the district court referred only to the Title VII claim and made no mention of the section 1981 basis for those claims.  However, in a separate section of the opinion discussing the defendants' argument that Walker's failure to promote claims under Title VII and section 1981 were barred by the relevant statutes of limitations, the district court stated

---

[12]    Preston did not allege a failure to promote claim.

15

that because those claims were not exhausted, it did not need to decide whether the claims were time barred. Additionally, later in the opinion, the district court stated that "[f]or the same reasons that this Court has dismissed Walker's Title VII claims, this Court hereby GRANTS Defendants' Motion for Summary Judgment on Plaintiff Walker's Section 1981 claim." Thus, through incorporation by reference, the district court apparently did dismiss the section 1981 failure to promote claims for failure to exhaust.

The district court erred in dismissing the § 1981 claims on that basis. "The use of section 1981 as an avenue for redress of employment discrimination is not constrained by the administrative prerequisites [applicable to] Title VII claims . . . ." *Scarlett v. Seaboard Coast Line R. Co.,* 676 F.2d 1043, 1050 (5th Cir. Unit B 1982).

Nevertheless, as previously stated, the district court alternatively dismissed the section 1981 failure to promote claims on the merits. In the section of the opinion discussing whether the Title VII failure to promote claims were exhausted, the district court noted that even if it had been able to reach the merits of the claim, it would have dismissed the claims as a matter of law. Thus, in the alternative, the district court denied the Title VII failure to promote claims on the merits, finding that although Walker had demonstrated a prima facie case of discrimination, Glasfloss had articulated legitimate, non-discriminatory reasons for not promoting Walker, and she had failed

16

to demonstrate that the reasons were pretextual.  In that footnote the court never referred to the section 1981 basis for the failure to promote claims--it only mentioned the Title VII basis for the claim.  As set forth above, however, the district court in a later section of the opinion expressly stated that it granted the defendant's motion for summary judgment on the section 1981 claims for the same *reasons* it granted summary judgment on the Title VII claims.  Again, the district court was incorporating by reference another section of the opinion.  Thus, the only fair reading of the opinion is that the district court also denied in the alternative the § 1981 claims on the merits.  The district court was free to adopt the same basis for deciding both types of failure to promote claims because employment discrimination claims brought under both § 1981 and Title VII are analyzed under the Title VII evidentiary framework.  *Lawrence v. University of Tx. Med. Branch at Galveston,* 163 F.3d 309, 311 (5th Cir. 1999).

We conclude that Walker incorrectly argues that the district court dismissed the § 1981 claims *solely* on the basis that she had failed to exhaust her administrative remedies.  Walker does not challenge the district court's denial of her § 1981 claim on the merits in her appellate brief.  By failing to do so, she has abandoned that argument on appeal.  *See Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 183 n.5 (5th Cir. 1996).  We therefore affirm the district court's grant of summary judgment on Walker's section 1981 failure to promote claims.

17

C.   HOSTILE WORK ENVIRONMENT CLAIMS

The appellants argue that the district court erred in granting summary judgment in favor of the appellees on the claim of hostile work environment in violation of Title VII.  To survive summary judgment, the appellants must create a fact issue on each of the elements of a hostile work environment claim: (1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment.  *See DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 594 (5th Cir. 1995) (hostile work environment based on sexual harassment).  In determining whether a working environment is hostile or abusive, all circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Systems, Inc.,* 114 S.Ct. 367, 371 (1993).

The appellants must show that the discriminatory conduct was severe or pervasive enough to create an objectively hostile or abusive work environment.  *Id.* at 370.  This Court has opined that "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII."  *Wallace v. Texas Tech University,* 80 F.3d

18

1042, 1049 n.9 (5th Cir. 1996) (citing *DeAngelis,* 51 F.3d at 593). In that case, we assumed *arguendo* that if there was specific evidence of "routinely [made] racist remarks," then a fact issue had been raised to prevent summary judgment. *Id.* at 1049 (brackets in opinion).

In the instant case, the district court granted summary judgment, concluding that "[n]one of these comments were physically threatening or humiliating, nor did they unreasonably interfere with Walker and Preston's work. Instead, they were simply truly offensive." We disagree.

Without restating all the evidence of racial remarks and allegations set forth previously in this opinion, we conclude that, viewing the evidence in the light most favorable to the appellants, they have created a genuine issue of material fact with respect to their claim of hostile work environment. The offensive remarks began in 1994, shortly after Walker was hired and had not ceased the week prior to the appellants' resignations in May of 1997. While working for Glasfloss, the appellants at various times were subjected to: comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African-Americans, and conversations in which a co-worker and supervisor used the word "nigger." The office manager also informed them that the vice-president did not want the African-American women to talk to each other.

Further, we note that the district court never mentioned the

19

fact that Porter, an African-American woman not party to this suit, resigned because she felt she could no longer tolerate the racism and discrimination at Glasfloss. Under these circumstances, we are persuaded that the appellants have created a fact issue with respect to whether the racial insults they endured were sufficiently severe or pervasive to alter the conditions of employment and create a hostile or abusive work environment.

Relying on two Supreme Court cases, the appellees argue that even if we determine that there is a fact issue in regard to the hostile work environment claim, there are entitled to summary judgment because of the prompt, remedial action taken after receiving Walker's letter outlining her complaints. *Burlington Industries, Inc. v. Ellerth,* 118 S.Ct. 2257 (1998) (sexual harassment under Title VII); *Faragher v. City of Boca Raton,* 118 S.Ct. 2275 (1998) (same).[13] In those two cases, the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington,* 118 S.Ct. at 2270; *Faragher,* 118 S.Ct. at 2292-93. However, when no tangible employment action has been shown, an employer is entitled to raise an affirmative defense to such claim. The two elements of this affirmative defense are:

---

[13] Although those two cases involved sexual harassment instead of racial harassment, the Supreme Court indicated its approval of Courts of Appeals in sexual harassment cases drawing from standards developed in racial harassment cases. *Faragher,* 118 S.Ct. at 2283 n.1.

"(a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." 118 S.Ct. at 2270; 118 S.Ct. at 2293.

Here, as discussed elsewhere in our opinion, no tangible employment action has been shown. This affirmative defense therefore is available to the appellees. Apparently, in an attempt to demonstrate the first element of the affirmative defense, the appellees point to the policy statement it had against discrimination. It is undisputed that the Glasfloss employee handbook contained an EEOC policy statement against discrimination,[14] however, it appears that Glasfloss had not promulgated a complaint procedure specifically to address racial harassment.[15] In his deposition, Lange, the president of Glasfloss, testified that there were no specific policies for the vice-

---

[14] The policy statement read as follows:

> It is the policy of the company not to discriminate in recruitment, hiring, compensation, promotion or any other condition of employment on the basis of race, color, national origin, religion, sex, age, physical or mental handicaps, marital status, pregnancy or parenthood.

[15] The handbook instructs employees who believe they have been subject to *sexual* harassment to notify management immediately. The handbook also has a section regarding employee complaints in general. That section instructs the employee to contact his immediate supervisor regarding the problem. If the problem is not resolved, then the employee should inform the appropriate manager.

21

president to follow if he received a race discrimination complaint against the office manager. The Supreme Court explained that although it is not necessary as a matter of law for an employer to have "promulgated an antiharassment policy with complaint procedure," the need for such an expressed policy may be raised when litigating the first element of the defense. *Faragher,* 118 S.Ct. at 2293. The lack of such a written policy procedure at Glasfloss certainly weighs in the appellants' favor in determining whether there is a genuine issue of material fact with regard to whether Glasfloss exercised reasonable care to prevent any racially harassing behavior.

We are not persuaded that the appellees have shown as a matter of law that they exercised reasonable care in correcting the racially harassing behavior. It is undisputed that Lange, who resided in Wisconsin, promptly responded in writing to Walker's complaint letter dated January 8, 1997. He then charged Kingston with the responsibility of investigating Walker's allegations of racism. The appellants' evidence, when viewed in the light most favorable to them, has demonstrated that Kingston (1) made the "picking fleas" remark; (2) laughed at McKnight's comment that people would think Walker was there to rob them; (3) had a policy against African-Americans talking to one another; and (4) greeted the appellants in a sarcastic manner every morning after the complaint. Additionally, it is undisputed that Kingston did not interview the other two African-American employees at the office,

22

Porter and Preston, regarding Walker's complaints of racism.

Finally, it should be noted that Kingston's investigation purportedly revealed no racial harassment or discrimination whatsoever. Kingston reached this conclusion even though (1) he testified during his deposition that Thompson was reprimanded for saying her grandmother rubbed a black child's head for good luck and (2) Thompson testified that Kingston informed her she should not have said to Walker that Brazilian nuts were called "nigger toes."

Based on the above alleged facts, we conclude that the appellees have failed to demonstrate as a matter of law the first element of the defense, *i.e.,* "that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior."

In regard to the second element of this defense--whether the employee unreasonably failed to utilize any opportunities provided by the employer or whether the employee failed to avoid harm otherwise[16]--the appellees point to the fact that the appellants

---

[16] Although the appellants did not report to Glasfloss the first racially offensive remarks, we do not believe that such delay entitles the appellees to judgment as a matter of law with respect to their affirmative defense. *Cf. Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 266 (5th Cir. 1999)(explaining that a "plaintiff's failure or delay in invoking anti-harassment procedures may suggest that a company lacked vigilance or determination to enforce them or that it appeared to turn a blind eye toward . . . harassment"); *Watts v. Kroger Co.,* 170 F.3d 505, 510-11 (5th Cir. 1999) (simply because an employee waited several months to complain of sexual harassment did not entitled employer as a matter of law to *Burlington/Faragher* affirmative defense).

23

refused to agree to the proposed settlement negotiated by the EEOC. However, in light of the appellants' testimony that the racial remarks and hostile actions continued after the internal investigation at Glasfloss, we are not persuaded that the appellants' refusal to sign the proposed settlement demonstrates the second element of this defense as a matter of law. Thus, because there is a genuine issue of material fact regarding this affirmative defense, and for the reasons stated earlier in this section, the district court's grant of summary judgment on the hostile work environment claim must be vacated and remanded.

D.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

There are four elements of a claim for intentional infliction of emotional distress under Texas law. *See Skidmore v. Precision Printing and Pkg., Inc.,* 188 F.3d 606, 613 (5th Cir. 1999). First, a plaintiff must show that the defendant acted intentionally or recklessly. Second, the defendant's conduct must have been extreme and outrageous--so outrageous as to go beyond all possible bounds of decency. Third and fourth, the actions of the defendant must have caused the plaintiff to suffer emotional distress, and the distress must be severe. *Id.* In the employer-employee context, Texas courts have found few incidents to constitute extreme and outrageous conduct. *Horton v. Montgomery Ward & Co.*, 827 S.W.2d 361, 369 (Tex.App.--San Antonio 1992, writ denied).[17]

_____

[17]    This Court has held that causing an innocent employee to be subject to an accusation of theft because she opposed an illegal employment practice constituted extreme and outrageous conduct.

24

Insults, indignities, threats, annoyances, or petty oppressions, without more, do not rise to the level of intentional infliction of emotional distress. *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). Conduct that is illegal in the context of employment does not necessarily constitute extreme and outrageous conduct. *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993). Neither does condemnable conduct necessarily translate into conduct that rises to the level of extreme and outrageous. *Id.* (explaining that although we condemned supervisor's use of ethnic slurs against employee on a few occasions, such conduct was not sufficiently extreme or outrageous to support claim for intentional infliction of emotional distress).

In *Thomas v. Clayton Williams Energy, Inc.*, the Texas Court of Appeals found that a supervisor's frequent use of racial epithets against an employee did not rise to the level of extreme and outrageous conduct. 2 S.W.3d 734, 740-41 (Tex.App.--Hous. (14(Dist.) Sept. 23, 1999)). In the case at bar, although the appellee's racial harassment of the appellants may have been illegal (we have found there is a genuine issue of material fact with respect to their claim of hostile work environment under Title VII), it does not rise to the level of extreme and outrageous conduct under Texas law.[18] Accordingly, the district court properly

---

*Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 307 (5th Cir. 1989).

[18] As to the third and fourth factors involving the emotional distress itself, the appellants simply assert that "they have

25

granted summary judgment for the appellees on the Texas tort claim of intentional infliction of emotional distress.

E.   RETALIATION CLAIMS

To demonstrate a claim for retaliation, the appellants must prove (1) that they engaged in an activity that was protected; (2) an adverse employment action occurred; and (3) a causal connection existed between the participation in the activity and the adverse employment action. *Webb v. Cardiothoracic Surgery Assoc*, 139 F.3d 532, 540 (5th Cir. 1998).  Here, we are concerned solely with ultimate employment decisions.  *Id.*

The appellants correctly assert that they engaged in a protected activity when they filed a complaint with the EEOC. *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir. 1995) (explaining that "[t]here can be no question that [the employee's] retaliation claims satisfy the first element of the analysis, filing an administrative complaint is clearly protected activity").  Thus, the first prong is satisfied.

Preston contends that she suffered an adverse employment action when Glasfloss took from her a major account, the Kansas City Air Filter account.  The parties recognize that ultimate employment decisions include acts "such as hiring, granting leave, discharging, promoting, and compensating." *Dollis,* 77 F.3d at 782. Our case law indicates that the removal of an account would not

---

testified that they have suffered feelings of emotional distress sufficient to allow for emotional distress damages."

constitute an adverse employment action.  In *Dollis*, the employee alleged, among other things, that she was refused consideration for promotion, refused attendance at a training conference, and her work was criticized to a government vendor.  77 F.3d at 779-80.  We held that these were at most "tangential" to future decisions that might be ultimate employment decisions.  Likewise, in *Mattern v. Eastman Kodak Company,* 104 F.3d 702, 708 (5th Cir. 1997), this Court found the following events did not constitute adverse employment actions because of their lack of consequence: verbal threat of being fired, reprimand for not being at assigned station, missed pay increase, and being placed on "final warning." Preston's removal from a major account without other consequences (such as an unwanted reassignment)[19] "does not equal being discharged" nor does it "rise above having mere tangential effect on a possible future ultimate employment decision." *Mattern,* 104 F.3d at 708.

As stated above, to prove retaliation, both Walker and Preston recognize that they must demonstrate their employer discriminated against them in such things as "hiring, granting leave, discharge, promoting and compensating."[20]  The appellants argue that they were discriminated against in the context of taking leave.  They assert

---

[19]  *Burlington,* 118 S.Ct. at 2268.

[20] Although the appellants raised the issue of constructive discharge in the district court, on appeal the appellants do not allege constructive discharge to satisfy the requirement of adverse employment action.

27

that Thompson prevented "them from taking their breaks together after they complained to the EEOC." More specifically, the appellants claim that "Thompson would seek out the two ladies while they were on break and look at them in distaste and put her hands on her hips in a gesture of disapproval." The appellants cite no authority to support their contention that "granting leave" in this context would encompass taking a short break. They have not shown that this constitutes an adverse employment action.

Finally, Walker contends that when Thompson deducted her overtime pay on one occasion in 1997, it was in retaliation for Walker's EEOC complaint. This claim is premised entirely on the fact that Walker was not initially paid $2.89 for overtime she failed to have approved in advance pursuant to Glasfloss's policy. Again, Walker cites no authority that would support her argument on this issue and cannot demonstrate that this *de minimis* loss of pay rose to the level of an adverse employment action.

Accordingly, both Walker's and Preston's retaliation claims fail.

III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's summary judgment against Walker with respect to her section 1981 failure to promote claims. We AFFIRM the district court's summary judgment against Walker and Preston with respect to their intentional inflection of emotional distress and retaliation claims. We VACATE the district court's grant of summary judgment

28

against Walker and Preston with respect to their hostile work environment claims and REMAND for trial.

AFFIRMED in part, VACATED and REMANDED in part.