United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 30, 2004**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 3, 2004

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 03-50454

AT&T CORP. and AT&T COMMUNICATIONS OF TEXAS LP,

Plaintiffs-Appellees,

VERSUS

PUBLIC UTILITY COMMISSION OF TEXAS, ET AL.,

Defendants,

REBECCA KLEIN, in her official capacity as Chairman of the Public
Utility Commission of Texas; PAUL HUDSON, in his official capacity
as Commissioner of the Public Utility Commission of Texas; JULIE
PARSLEY, in her official capacity as Commissioner of the Public
Utility Commission of Texas,

Defendants-Appellants.

Appeal from the United States District Court
For the Western District of Texas

Before REAVLEY, DAVIS and DeMOSS, Circuit Judges,

W. EUGENE DAVIS, Circuit Judge:

Defendants, the Commissioners of the Texas Public Utilities

Commission ("Commissioners") challenge the district court's order

granting plaintiffs', AT&T Corp. and AT&T Communications of Texas, LP's ("AT&T"), motion for summary judgment. The district court determined that the Telecommunications Act of 1996 ("TA96")[1] preempted the Texas statute which imposed a regulatory fee on intrastate, interstate, and international calls originating in Texas. We agree with the district court that the Texas assessment on multijurisdictional carriers burdens those carriers more than purely interstate carriers. The assessment is discriminatory, in conflict with § 254(f) of the TA96, and preempted. We therefore AFFIRM.

I

The TA96 amended the Telecommunications Act of 1934 to encourage widespread competition among telecommunications providers and at the same time provide universal telecommunications service to all Americans. The new act empowered both States and the Federal Communications Commission ("FCC") to define universal service and create universal service support programs. Both the FCC and the States were given the power to collect assessments from telecommunications carriers in order to subsidize these programs, particularly services to rural, high cost, and low income users. Under the TA96, the Federal Universal Service Fund specifically subsidizes telecommunications providers who provide interstate

---

[1]Pub. L. No. 104-104, 110 Stat. 56 (codified in scattered sections of title 47 U.S.C.).

2

service to users in high cost and rural areas, low income users, schools, and libraries, 911 service to rural areas, and relay service to the hearing impaired. Similarly, Texas's Public Utilities Commission, through Texas Universal Service Support Mechanisms, subsidizes intrastate telecommunications carriers who provide these types of services intrastate.

Congress explicitly authorized the collection of funds to support these universal service programs under TA96. The Federal Universal Service Fund is supported by an equitable and nondiscriminatory fee on all *interstate* telecommunications service providers:

> (d) Telecommunications carrier contribution
>
> Every telecommunications carrier that provides *interstate* telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service.

47 U.S.C. § 254(d) (emphasis added).

Congress empowered States to collect funds from carriers providing *intrastate* telecommunications services. As with the federal universal service scheme, the assessment must be equitable and nondiscriminatory. Furthermore the state universal service mechanisms cannot burden or rely upon the federal universal service system:

> (f) State authority
>
> A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal

3

service.  Every telecommunications carrier that provides *intrastate* telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State.  A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

47 U.S.C. § 254(f) (emphasis added).

This dual universal service scheme allows the FCC to assess interstate service providers to fund federal universal service programs and allows the States to assess intrastate providers to fund the state universal service programs.  The statute, however, has no provision for treatment of multijurisdictional carriers, i.e., carriers that provide both intrastate and interstate service.  Congress's omission on that issue is the source of the conflict in this case.[2]

In 1997 the Texas Public Utilities Commission instituted its state universal service program funded by the Texas Universal Service Fund ("TUSF").  The Commission imposed a 3.6% fee to provide revenue for the TUSF.  The fee was imposed on all telecommunications carriers who provide any intrastate service.  As

---

[2]We have previously dealt with the complications associated with multijurisdictional carriers in determining that the FCC was not permitted to assess intrastate revenues of multijurisdictional carriers. *See Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999).  This is the first time, however, that we have addressed the issue of whether States can assess the interstate revenues of multijurisdictional carriers.

to these carriers, however, the fee applied to all revenue they derived from intrastate, interstate, and international calls originating in Texas. Thus multijurisdictional carriers were forced to pay both the federal universal service fee *and* the state universal service fee on interstate calls originating in Texas.[3]

AT&T objected to paying both federal and state fee on its revenue from interstate calls and brought this suit in the district court to challenge the state fee. Plaintiff complains that the Texas Universal Service funding mechanism is preempted by federal law because the state fee on revenue derived from interstate calls conflicts with 47 U.S.C. § 254(f). More particularly, AT&T argues that the PUC universal service funding mechanism violates § 254(f) because it creates an inequitable and discriminatory assessment on interstate calls and "relies on or burdens" the federal support mechanisms. AT&T moved for summary judgment on this preemption issue. The district court granted the motion and struck down the Texas Public Utility Commission's funding mechanism finding that it was preempted because it conflicted with § 254(f).

The Commissioners now challenge the district court judgment. They argue, as they did before the district court, that 1) the "rely on or burden" prong of 254(f) does not apply to state universal service support mechanisms, like the Texas mechanisms in this case, because the State has not provided standards for

---

[3]The FCC funds the Federal Universal Service programs by assessing all interstate calls at a rate of 7.2805%.

universal service that differ from the federal standards; 2) the regulation funding scheme does not "rely upon or burden" federal mechanisms; 3) AT&T has not demonstrated that the Texas universal service support mechanisms are discriminatory or inequitable; and 4) the Texas regulatory funding scheme does not violate the dormant commerce clause. We agree with the district court's decision to grant summary judgment in favor of AT&T based upon the discriminatory and inequitable nature of the state assessment and do not reach the State's remaining arguments.

II

This Court reviews a district court's grant of summary judgment *de novo*, applying the same legal standards as the district court in determining whether summary judgment was appropriate. *United States v. Lawrence*, 276 F.3d 193, 195 (5th Cir. 2001) We must therefore find any disputed facts in favor of the non-moving party and determine whether a genuine issue of material fact exists in the case. *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000). All questions of law are reviewed *de novo*. *Id.* The material facts in this case are not in dispute, therefore we review *de novo* the district court's preemption decision and the interpretation of the TA96.

Preemption of state law occurs in three circumstances:

Federal law will override state law under the Supremacy Clause when (1) Congress expressly preempts state law;

6

> (2) Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme; or (3) state law conflicts with federal law or its purposes.

*Frank v. Delta Airlines Inc.*, 314 F.3d 195, 197 (5th Cir. 2002) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79, (1990)).

The burden of persuasion in preemption cases lies with the party seeking annulment of the state statute. *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 230 (3d Cir. 2001) ("Finally, we note that the party claiming preemption bears the burden of demonstrating that federal law preempts state law." (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984))).

AT&T claims that the Texas universal service assessment is preempted through conflict preemption. Conflict preemption "arises when 'compliance with both federal and state regulations is a physical impossibility,' . . . where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[,]'" *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983), where "the state law mandates or places irresistible pressure on the subject of the regulation to violate federal law, . . . or where the federal scheme expressly authorizes an activity which the state scheme disallows." *Wells Fargo Bank of Texas NA v. James,* 321 F.3d 488, 491 n.3 (5th Cir. 2003) (citations omitted).  In this case, if preemption exists at all it is because the state regulation frustrates the purposes of Congress in passing § 254(f).

We now turn to the critical issue in this case: whether the Texas universal service assessment conflicts with § 254(f) of the TA96.

III

AT&T argued, and the district court agreed, that the Public Utility Commission's assessment of revenues derived from both interstate and intrastate calls was inequitable and discriminatory because it burdened multijurisdictional carriers more harshly than their pure interstate competitors.

This Court has previously found a similar universal service regulatory funding scheme to be inequitable and discriminatory. In *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ("*TOPUC*") this Court determined that the FCC could not collect on both interstate and international calls because such a regulation was inequitable and discriminatory in violation of § 254(d). Plaintiff COMSTAT, a small, telecommunications carrier carrying both interstate and international calls, had sued the FCC for recovery of federal fees imposed by the FCC on its international revenues. COMSTAT derived so little revenue from interstate calls that its Federal Universal Service Fund tax obligations exceeded its interstate revenues. COMSTAT argued that the FCC assessment of the revenue it derived from both interstate and international calls and the consequent unfairness violated the

8

"equitable and nondiscriminatory" restriction placed upon any Federal universal service funding mechanism scheme by § 254(d). The Court agreed with COMSTAT's reasoning:

> Therefore, the agency's interpretation of "equitable and nondiscriminatory," allowing it to impose prohibitive costs on carriers such as COMSTAT, is "arbitrary and capricious and manifestly contrary to the statute [§ 254(d)]." COMSTAT and carriers like it will contribute more in universal service payments than they will generate from interstate service. Additionally, the FCC's interpretation is "discriminatory," because the agency concedes that its rule damages some international carriers like COMSTAT more than it harms others. The agency has offered no reasonable explanation of how this outcome, which will require companies such as COMSTAT to incur a loss to participate in interstate service, satisfies the statute's "equitable and nondiscriminatory" language. We therefore reverse and remand this portion of the Order for further consideration.

*TOPUC*, 183 F.3d at 434-35 (citations omitted).

Although *TOPUC's* holding is based upon the "equitable and nondiscriminatory" language in § 254(d), § 254(d) and (f) are companion sections and § 254(d)'s "equitable and nondiscriminatory" limitation on the federal funding mechanism is identical to the language in § 254(f) limiting the State's authority to fund universal service:

> (d)    Telecommunications carrier contribution.    Every telecommunications carrier that provides interstate telecommunications services shall contribute, *on an equitable and nondiscriminatory basis*, to the specific, predictable, and sufficient mechanisms established by the Commission . . . .
>
> * * *
>
> (f) State authority.  A State may adopt regulations not inconsistent with the Commission's rules to preserve and

> advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, *on an equitable and nondiscriminatory basis*, in a manner determined by the State to the preservation and advancement of universal service in that State.

47 U.S.C. § 254 (emphasis added).

Given the symmetry of §§ 254(d) and (f), *TOPUC* dictates the result in this case. The assessment of interstate *and* intrastate telecommunications revenues has the same inequitable and discriminatory effect as the FCC's assessment of interstate and international revenues in *TOPUC*.[4] Given the state regulation scheme multijurisdictional carriers will be forced to pay an approximate 11% fee on their revenue derived from interstate telecommunications calls, while their pure-interstate-provider competitors pay only the 7.28% federal fee on interstate revenues. The result is a regulation that is clearly unfair and discriminates between telecommunication service providers based solely upon their presence in the intrastate market.

In *TOPUC* there was clear evidence that COMSTAT carried so few interstate calls that it was forced to pay more in universal service fees than it realized in interstate revenues, the revenues that triggered the federal fee. AT&T has not, and admittedly cannot, present evidence that its universal service fee obligation outweighs its intrastate revenues. Nevertheless, the absence of

---

[4]All of the reasoning in this opinion applies equally to the PUC's assessment of AT&T's international revenue originating in Texas.

10

such evidence does not defeat its assertion that the state regulation is discriminatory.

Regardless of the amount of intrastate revenues a carrier earns, the double assessment of interstate revenue puts multijurisdictional carriers at a distinct competitive disadvantage compared with the pure interstate carriers. The funding mechanism, therefore, burdens multijurisdictional carriers more severely than pure interstate or intrastate carriers. As this Court recognized in *TOPUC*, a regulation scheme "is 'discriminatory,' because . . .[it] damages some international carriers . . . more than it harms others." *TOPUC*, 183 F.3d at 434. AT&T is damaged more than its non-multijurisdictional competitors thus making the PUC regulation discriminatory and in violation of § 254(f).

## IV.

For the reasons stated above the PUC's assessment on both interstate and intrastate calls creates an inequitable, discriminatory, and anti-competitive regulatory scheme. Given the parallel language used in §§ 254(d) and (f), we conclude, consistent with our decision in *TOPUC*, that the PUC assesment of interstate and international calls is discriminatory, conflicts with § 254(f), and thus is preempted by federal law. We therefore affirm the district court's judgment.

AFFIRMED.