Tyrone **HAMILTON**, Plaintiff,

v.

**TEXAS DEPARTMENT OF TRANSPORTATION,**
Defendant.

**No. Civ.A. 99–CV–1907.**

United States District Court,
S.D. Texas,
Houston Division.

May 10, 2001.

Sheila Beth Owsley, Houston, TX, Elizabeth M. Bruman, Zimmerman Axelrad, Houston, TX, Tyrone Hamilton, Houston, TX, for plaintiff.

Henry M. De La Garza, Office of Atty. Gen., Austin, TX, for defendant.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

Plaintiff, Tyrone Hamilton, sued his employer, the Texas Department of Transportation ("TxDOT"), alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). TxDOT filed a motion for summary judgment as to all Hamilton's claims, to which Hamilton filed a reply. (Docket Entry Nos. 26, 27). TxDOT filed motions to strike Hamilton's reply, Hamilton's supporting affidavit, and several of Hamilton's summary judgment exhibits. (Docket Entry Nos. 28, 29, 31).

Based on the pleadings, the motions and responses, the summary judgment record, and the applicable law, this court GRANTS Hamilton's motion to extend time; DENIES TxDOT's motion to strike Hamilton's response; GRANTS TxDOT's motion for summary judgment; DENIES TxDOT's motions to strike certain summary judgment evidence; and DENIES TxDOT's motion in limine as moot. The reasons for these rulings are set out below.

## I. Background

On June 20, 1994, the Traffic Engineering Section at TxDOT hired Hamilton as a temporary employee. (Docket Entry No. 27, Ex. 42, p. 1). Hamilton had previously received a Bachelor of Science Degree in Engineering from Southern University A & M in 1991. (*Id.*). As a temporary employee, Hamilton worked as an Engineering Assistant I in TxDOT Computer Transportation Management Systems. (*Id.*). While working at TxDOT, Hamilton attended classes at Texas Southern University. He received a Master of Science Degree in Transportation Management and Planning in May 1996. (*Id.*). On March 1, 1995, after a competitive posting and hiring process, TxDOT hired Hamilton as an Engineering Assistant II in the same section in which he had been a temporary employee. (*Id.* at pp. 2, 4).[1] Hamilton went from a State pay group A–14 to A–15. (Docket Entry No. 26, Ex. 3).

The record reveals confusion as to the relationship between titles given to certain TxDOT positions and the responsibilities of those positions. TxDOT uses business job descriptions to identify the positions and uses State titles to determine the level at which the position should be paid. "Many times employees and supervisors mix up or confuse the business titles and state titles." (Docket Entry No. 26, Ex. 3).

Hamilton asserts that as an Engineering Assistant II, he was "authorized to do work of the Traffic Engineering Section Manager (District Traffic Section Manager)." (Docket Entry No. 26, Ex. 42, p. 2.) TxDOT denies that Hamilton had a managerial position and asserts that Hamilton had no managerial responsibility. An organizational chart dated September 27, 1995 shows Hamilton in the previously vacant position of "Traffic Engineering Section Manager," supervising five other employees, including Carl T. Reilly. (Docket Entry No. 27, Ex. 7). TxDOT maintains that this organizational chart is incorrect and that Hamilton, a State pay group A–15, was not a Traffic Engineering Section Manager, a State pay group A–18. (Docket Entry No. 26, Exs. 2, 3). Hamilton asserts that the "duties and responsibilities of the Engineering Assistant II (Traffic Engineering Section Manager) are very similar to the position of Engineer Special-

---

1. During his employment, Hamilton participated in the TxDOT Young Engineer's Pro- gram. (*Id.* at p. 10).

ist II (District Traffic Manger [sic])." (Docket Entry No. 27, Ex. 42, p. 4). He also maintains that "[a]lthough [he] was classified as an Engineer II, [he] performed the functions of the Traffic Engineering Section Manager position in the Traffic Engineering Section. This was a Supervisory position." (*Id.*). Hamilton alleges that he supervised Engineering Technicians and that Reilly was an Engineering Technician. (*Id.* at pp. 4–5). TxDOT denies that Hamilton was a supervisor or manager or that Hamilton performed any supervisory tasks. (Docket Entry No. 26, Exs. 2, 3).

It is undisputed that after Hamilton's first six months of employment, Reilly completed Hamilton's evaluation and performance plan. Such a task is generally completed by an employee's supervisor, not by a subordinate. (Docket Entry No. 26, Exs. 1, 2). Reilly rated Hamilton as "Meets Requirements," the second highest of five possible ratings. At this time, and throughout their employment together, Reilly was in a higher State pay group level than was Hamilton. (Docket Entry No. 26, Ex. 3).

In February 1996, Hamilton received a performance evaluation from William P. Ezzell, Hamilton's direct supervisor. Ezzell gave Hamilton a rating of "Exceeds Requirements," the highest of five possible ratings. (Docket Entry No. 27, Ex. 13). Ezzell also recommended that Hamilton receive a promotion and pay increase, based on the performance evaluation he received and the master's degree program he pursued. TxDOT refers to Hamilton's promotion as a "regular career-ladder promotion." (Docket Entry No. 26, Ex. 3). Hamilton received a promotion from Engineering Assistant II to Engineering Assistant III and went from State pay group A–15 to State pay group A–16. (Docket Entry No. 26, Ex. 3).

In February 1997, Ezzell once again evaluated Hamilton, giving him a rating of "Exceeds Requirements." (Docket Entry No. 27, Ex. 14). On April 1, 1997, M. Wayne Jones, Director of Traffic Operations, wrote to Steve E. Simmons, Jones's manager, recommending Hamilton's "advancement to Group 17, Step I." (Docket Entry No. 27, Ex. 2). The subject line of the letter is entitled "Promotion Request Approval for/ Mr. Tyrone Hamilton/ Traffic Engineering Section, Mgr. 0696." (*Id.*). Hamilton contends that this letter "represents a promotion request dated April 1, 1997, for [his] move to the Traffic Engineering Section Manager position." (Docket Entry No. 27, Ex. 42, p. 5). The letter does not mention the title or position of Traffic Engineering Section Manager. (Docket Entry No. 27, Ex. 2). Hamilton did receive a promotion from Engineering Assistant III to Engineering Assistant IV (Engineering Specialist I), moving from State pay group A–16 to State pay group A–17. (Docket Entry No. 26, Ex. 3).

In May 1997, Ezzell promoted Reilly to the position of District Traffic Section Manager. (Docket Entry No. 27, Ex. 42, pp. 5–6). Ezzell did not post the position and the promotion was noncompetitive. (Docket Entry No. 27, Ex. 10). Ezzell and Sally G. Wegmann, TxDOT Director of Transportation Operations, characterized the promotion as a standard career-ladder promotion for Reilly. (*Id.* at p. 11; Docket Entry No. 26, Ex. 2). At the time of the promotion, Reilly did not have a college degree; however, Reilly had fifty years of experience in the field, including thirteen years in the section in which he and Hamilton worked. In May 1997, Hamilton also received a promotion to Engineering Assistant IV and a pay increase to State pay group A–17. (Docket Entry No. 27, Ex. 19). Reilly became Hamilton's supervisor. (Docket Entry No. 27, Ex. 42, p. 7).

On November 19, 1997, Ezzell told Hamilton that he was Reilly's "assistant." (*Id.* at 7–8). Hamilton refused the classification. (*Id.*). On November 20, 1997, Ezzell and Hamilton had a contentious meeting about the section reorganization, including Reilly's promotion. (Docket Entry No. 27, Exs. 16, 42). During the meeting, Ezzell also gave Hamilton a performance evaluation and asked Hamilton to sign it. (Docket Entry No. 27, Ex. 42, p. 9). In the evaluation, Ezzell gave Hamilton a "Meets Requirements" rating, the second highest of the five possible ratings, and one level lower than the February evaluation of Hamilton's work. (Docket Entry No. 27, Ex. 17). According to Hamilton, Ezzell also said that by refusing to work for Reilly, Hamilton showed that he was not a "team player." (Docket Entry No. 27, Ex. 42, p. 9).

On November 24, 1997, Ezzell placed a memorandum in Hamilton's personnel file documenting the November 20 meeting. (Docket Entry No. 27, Ex. 18). In the memorandum, Ezzell stated that "Mr. Hamilton will not work for Mr. Carl Reilly because he lacks supervisory or management skills, and cannot delegate work. The Young Engineer's Manual requires a Registered Professional Engineer to be his supervisor." (*Id.*). According to Hamilton, Ezzell began sending Reilly out to "reinspect" Hamilton's work. (Docket Entry No. 27, Ex. 42, pp. 10–11). On December 18, 1997, Hamilton met with Ezzell and Wegmann to discuss the new organization of the Traffic Engineering Section. (*Id.* at 11). Hamilton stated in his affidavit that Wegmann promised to investigate and report her findings to Hamilton, but did not do so. (*Id.*).

On January 6, 1998, Hamilton filed Charge No. 330–98–0818 with the Equal Employment Opportunity Commission ("EEOC"). (Docket Entry No. 27, Ex.

26). In his charge, Hamilton alleged that he received less favorable treatment than non-black employees; that he was denied a promotion to District Section Manager; that his work was reinspected without justification; and that he had received a less favorable evaluation, all based on racial discrimination. (*Id.*). On September 30, 1998, the EEOC issued a determination that TxDOT had discriminated against Hamilton on the basis of his race. (Docket Entry No. 27, Ex. 1). On December 9, 1998, Hamilton filed Charge No. 330–99–0650. (Docket Entry No. 27, Ex. 27).

In February 1999, TxDOT discovered that Reilly should not have received the 1997 promotion to District Traffic Section Manager without posting the position and making it a competitive promotion. (Docket Entry No. 27, Ex. 29). TxDOT removed Reilly from the position, posted the position, and hired an Hispanic male for the position. (*Id.*). Hamilton applied for the posted position. TxDOT did not consider Hamilton on the ground that he lacked experience as a manager or a supervisor necessary to qualify for the position. (*Id.*). Hamilton does not challenge this employment decision.

On May 10, 1999, Ezzell met with Hamilton and gave him another performance evaluation. (Docket Entry No. 27, Exs. 31, 42). Hamilton asserts that this evaluation was the first feedback he had received since November 1997, making the evaluation late by several months. (Docket Entry No. 27, Exs. 30, 42). Hamilton describes the May 1999 evaluation as "unsatisfactory." (Docket Entry No. 27, Ex. 42, p. 18). The evaluation did not give Hamilton an overall rating and was not signed. (Docket Entry No. 30). It appears that Hamilton made a copy of the performance review before signing it, then refused to sign it. (Docket Entry No. 27, Ex. 32). In his affidavit, Hamilton stated

that the "re-experience confrontation was very torment [sic] and agony [sic] with the overwhelming feeling of alienation and anxiety; I became immobilized with angry [sic] and left work with the document. Why wasn't this documentation not [sic] in my personal [sic] file?" (Docket Entry No. 27, Ex. 30).

On July 20, 1999, Ezzell gave Hamilton two written reprimands. (Docket Entry No. 27, Exs: 32, 33). The first "Progressive Disciplinary Action Documentation Form" is dated July 1, 1999 and indicates that it is a "written reprimand," the lowest of seven stages of discipline. (Docket Entry No. 27, Ex. 32). The reprimand, which arose from the May 10, 1999 meeting, stated that Ezzell told Hamilton to read and sign the evaluation, making any comments Hamilton thought were necessary, before making a copy of the evaluation. (Id.). According to the reprimand, Hamilton stated, " 'I am going to make a copy now' and ran out of [Ezzell's] office with the original evaluation." (Id.). Ezzell then searched for Hamilton at each of the copier machines in the building, but could not locate him. Hamilton called Ezzell's assistant the next day to report that he was taking sick leave. The reprimand stated that "Mr. Hamilton has called in sick on 3 days following this incident. On the fourth day he gave [Ezzell's] administrative assistant a clinic notice that he was seen on May 13, 1999, and could return to work on May 17, 1999." (Id.). Before issuing the written reprimand, Ezzell and Hamilton held a "predetermination meeting" to afford Hamilton the "opportunity to advise [Ezzell] if he could give [Ezzell] any reason why [he] should not write him up for his behavior." (Id.).

The second "Progressive Disciplinary Action Documentation Form," also a "written reprimand," arose from two incidents occurring on June 21, 1999. (Docket Entry No. 27, Ex. 33). According to Ezzell, Hamilton twice came into Ezzell's office, speaking in a raised voice, demanding to know why certain projects were given to certain employees. (Id.). "Mr. Hamilton also asserted, once again, that he was equal in every way to Mr. Carl Reilly (who really had no part of this discussion ...). Apparently, Mr. Hamilton still contends that he should have M. [sic] Reilly's position and be like him in every way, including salary. He was advised by me that he was not on working par with Mr. Reilly." (Id.). The reprimand concludes that "Mr. Hamilton stated that he [would] 'see me in Court' which is his usual threatening attitude to anyone he disagrees with." (Id.).

On July 20, 1999, Ezzell gave Hamilton a written performance evaluation. (Docket Entry No. 34). The performance evaluation appears to cover the same period as the evaluation Hamilton refused to sign on May 10, 1999. Ezzell gave Hamilton an overall rating of "Below Standards," the lowest of three possible ratings. In his comments, Ezzell stated that "[f]or the past two years, employee's performance has not been up to par. Employee apparently spends an inordinate amount of time [sic] working on his grievance against the State.... Basic to any engineering course is the ability to draw, sketch, or draft ideas on paper or in computer [sic] to readily explain certain situations, be you a supervisor or a technician or an engineer. Mr. [sic] has steadfastly refused to do any of this basing his reasoning on his belief that he is a supervisor and that is not his job function. Mr. Hamilton needs more experience before he can supervise in TxDOT." (Id.). Hamilton refused to sign this performance evaluation. (Id.).

On June 17, 1999, Hamilton filed this lawsuit against TxDOT. After this court granted several stays to permit EEOC action to occur, TxDOT filed a motion for

summary judgment as to all Hamilton's claims. TxDOT argues that Hamilton has failed to make a *prima facie* showing of either discrimination or retaliation and failed to raise a disputed fact issue as to pretext. (Docket Entry No. 26). Hamilton argues that the summary judgment record reveals disputed issues of fact material to determining whether TxDOT discriminated against him on the basis of his race and retaliated against him for filing EEOC charges.

## II. The Applicable Legal Standards

### A. Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56. Under FED.R.CIV.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Norman v. Apache Corp.,* 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *See id.*

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the. mere allegations of its pleadings. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.1995). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548).

"[W]hen a district court denies a motion for summary judgment on the basis that there exist genuine issues of material fact, the district court is actually making two separate conclusions: 'First, the court has concluded that the issues of fact in question are genuine, i.e., the evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party. Second, the court has concluded that the issues of fact are material, i.e. resolution of the issues might affect the outcome of the suit under governing law.' " *Lemoine v. New Horizons Ranch & Ctr., Inc.,* 174 F.3d 629, 633 (5th Cir.1999) (quoting *Colston v. Barnhart,* 146 F.3d 282, 284 (5th Cir.), *cert. denied,* 525 U.S. 1054, 119 S.Ct. 618, 142 L.Ed.2d 557 (1998)).

In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Little,* 37 F.3d at 1075 (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

### B. Title VII

Under Title VII, it is unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to ... compensation; terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In a case alleging intentional discrimination, a plaintiff relying on inferential or circumstantial evidence must demonstrate a *prima facie* case of discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A *prima facie* case is established once the plaintiff has proved that he (1) is a member of a protected class; (2) was qualified for his position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class. *See Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir.1997). The *prima facie* case, once established, raises a presumption of discrimination, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions. *See Meinecke v. H & R Block*, 66 F.3d 77, 83 (5th Cir.1995) (citing *Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089 (1981)).

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. If a defendant can produce such evidence, the plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons." *Id.* at 253, 101 S.Ct. 1089. The Supreme Court has recently clarified that a "plaintiff's *prima facie* case, combined with sufficient direct evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employee unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The trier of fact may "infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147, 120 S.Ct. 2097; *see also Vadie v. Mississippi State Univ.*, 218 F.3d 365, 374 n. 23 (5th Cir.2000) (discussing application of *Reeves* ). At all times, the plaintiff retains the ultimate burden of persuasion. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. "[S]uch a showing by the plaintiff will [not] always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder would conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097.

For racial harassment to be actionable under Title VII as creating a hostile working environment, the harassment must be so "severe or pervasive" as to "alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (*quoted in Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)); *see also Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir.2000). "To survive summary judgment, the [plaintiff] must create a fact issue on each of the elements of a hostile work environment claim: (1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment." *Walker*, 214 F.3d at 625.

Title VII also forbids an employer from discriminating against an employee because the employee "opposed any practice

made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3. A plaintiff carries the initial burden of establishing a *prima facie* case of retaliation. The Fifth Circuit applies· the burden-shifting structure to claims of Title VII unlawful retaliation. *See Long v. Eastfield Coll.,* 88 F.3d 300, 304–05 (5th Cir.1996); *McMillan v. Rust Coll., Inc.,* 710 F.2d 1112, 1116 (5th Cir. 1983). A plaintiff establishes a *prima facie* case for unlawful retaliation by proving: (1) that he engaged in activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse employment action. *See Long,* 88 F.3d at 304; *McMillan,* 710 F.2d at 1116.

"The ultimate issue of retaliation requires the employee to prove that the adverse employment action would not have occurred 'but for' the protected activity." *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 n. 8 (5th Cir.), *aff'd after remand,* 163 F.3d 1356 (5th Cir.1998) (citing *Long,* 88 F.3d at 308). " '[E]ven if a·plaintiff's protected conduct is a substantial element in a defendant's [adverse employment] decision ..., no liability for unlawful retaliation arises if the [same decision would have been made] even in the absence of the protected conduct.' " *Vadie,* 218 F.3d at 374 (quoting *Long,* 88 F.3d at 305 n. 4) (brackets in original). The factors courts should consider in·de-termining whether summary judgment is appropriate include the strength of the *prima facie* case and the probative value of the proof that the employer's explanation is false. *See Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097.

## III. Analysis

### A. Hamilton's Race Discrimination and Racial Harassment Claim

 Hamilton alleges that TxDOT discriminated against him on the basis of his race in failing to promote him to the position of District Traffic Section Manager in May 1997. (Docket Entry No. 27). TxDOT argues that Hamilton was not qualified for the position; that TxDOT had legitimate, nondiscriminatory reasons for selecting Reilly; and that Hamilton has failed to point to any summary judgment evidence indicating that his race was a factor in TxDOT's promotion decision. (Docket Entry No. 26).

 In support of his claim of racial discrimination, Hamilton simply states that there "can be little question regarding the establishment of prima facie evidence in light of the EEOC's determination." However, the EEOC determination is not binding on this court. *See Dickerson v. Metropolitan Dade County,* 659 F.2d 574, 579 (5th Cir.1981); *Bynum v. Fort Worth Indep. Sch. Dist.,* 41 F.Supp.2d 641, 657 (N.D.Tex.1999).[2]

The parties agree that Hamilton is a member of a protected class. The parties

---

2. TxDOT has also provided summary judgment evidence raising questions as to the EEOC's investigation of Hamilton's charge. The EEOC did not hold a predetermination hearing with Assistant Attorney General Sarah Sarahan until September 30, 1998. (Docket Entry No. 32, Ex. 2). The EEOC investigator gave TxDOT until the end of that day to review Hamilton's documentation on which the EEOC based its determination. TxDOT did not receive the documentation until September 30, 1998. TxDOT had one day to respond and submit any documentation in . support of its position. The EEOC declined TxDOT's invitation to speak to Hamilton's co-workers or to any other TxDOT employee. The EEOC determination is dated that same day, September 30, 1998.

dispute whether Hamilton had the minimum qualifications necessary for the position. It is undisputed that the qualifications for District Traffic Section Manager included a minimum of nine years of experience in traffic studies and analysis, or a related area, which could include years of college or graduate level work in a related field. (Docket Entry No. 26, Ex. 3). TxDOT also required at least two years of supervisory or managerial experience, (Docket Entry No. 26, Ex. 1), and "extensive knowledge" of traffic data collection and traffic analysis, defined as a "broad knowledge of elements of a job and interrelated business areas to develop or direct the development of new methods, procedures, or processes, implement their use and integration into existing programs and assume responsibility for people or product." (Docket Entry No. 26, Exs. 1, 3). Hamilton does not dispute that these requirements were reasonably related to the position he sought.

The parties dispute whether the facts show that Hamilton had the necessary two years of managerial/supervisory experience. (Docket Entry Nos. 26, 27). Hamilton asserts that he served in a supervisory role for at least two years while he was with TxDOT. In support of his argument, Hamilton points to the internal organizational chart, dated September 27, 1995, that shows Hamilton in a supervisory position within his section. (Docket Entry No. 27, Ex. 7). The 1995 organizational chart shows Hamilton as a lead worker or supervisor and lists Reilly in a position below Hamilton's. Hamilton responds to TxDOT's argument that Reilly was his supervisor with summary judgment evidence indicating that as a member of the Young Engineer's Program, Hamilton had to have a certified engineer as a supervisor. It is undisputed that Reilly was not a certified engineer.

In response, TxDOT asserts that the organizational chart, which was never posted publicly, was inaccurate and that an accurate chart was posted once the error was discovered. (Docket Entry No. 26, Ex. 2). TxDOT also points to evidence indicating that Hamilton did not have any duties of a lead worker or of a supervisor. There is no evidence that Hamilton hired, evaluated, promoted, or disciplined other employees. TxDOT has provided summary judgment evidence that Reilly performed Hamilton's evaluation and performed similar supervisory duties. (Docket Entry No. 26, Exs. 1, 2). There is confusion as to whether Hamilton had the requisite supervisory experience for the promotion.

However, there is no confusion or dispute that Hamilton lacked the nine years of experience in traffic studies and analysis or a related area necessary to the promotion. (Docket Entry No. 26, Ex. 3). Hamilton received a bachelor's degree in 1991. The parties dispute whether his degree in engineering constituted a related area. This court assumes that Hamilton's college degree appropriately counts toward fulfilling the years of experience requirement. Based on TxDOT's method of counting related college or graduate work toward the required years of experience, Hamilton had four years of related experience by completing his undergraduate degree. Hamilton began working for TxDOT on June 20, 1994. Reilly was promoted in April or May 1997. Hamilton had less than three years of experience with TxDOT when Reilly was promoted. Hamilton also points to his graduate degree as related experience, but does not indicate the number of academic years he spent getting his degree. Typically, a masters' degree program is a two-year program. At most, double-counting the years Hamilton spent working while pursuing his graduate degree, Hamilton had

eight years and some months of experience in the field at the time of the challenged promotion.

Hamilton does not allege or provide any summary judgment evidence that TxDOT waived or reduced the nine-year experience requirement for non-black employees. It is undisputed that Reilly had significantly more than the nine years of experience required for the promotion. Hamilton has failed to produce summary judgment evidence creating a genuine issue of disputed fact as to whether he had the minimum qualifications for the position he sought.

TxDOT argues that even if Hamilton could make a *prima facie* showing of discrimination based on the 1997 failure to promote, TxDOT had legitimate nondiscriminatory reasons for selecting Reilly over Hamilton. Ezzell had a good faith belief that Reilly was already in a supervisory position in the section. (Docket Entry No. 26, Ex. 2). Both Ezzell and Reilly provided affidavit testimony that Reilly performed supervisory functions. (Docket Entry No. 26, Exs. 2, 4). TxDOT offers uncontroverted evidence that Reilly performed supervisory functions, such as evaluating Hamilton's performance in 1995. (Docket Entry No. 26, Ex. 1). TxDOT also points to the fact that Reilly had worked in his section for thirteen years, ten more years than Hamilton; he had a decade of supervisory experience; and he had fifty years of experience in related fields. (Docket Entry No. 26, Exs. 2, 4). Based on the requirements, which Hamilton does not challenge, Reilly was qualified and Hamilton was not, or, in the alternative, Reilly had better qualifications than Hamilton, both legitimate, nondiscriminatory reasons for selecting Reilly over Hamilton.

As evidence of pretext, Hamilton asserts that TxDOT failed to follow its own regulations by promoting Reilly without posting the position for competitive applications. TxDOT does not dispute that Ezzell and Wegmann relied on an outdated version of the applicable guidelines and erred in promoting Reilly noncompetitively. However, TxDOT provides uncontroverted evidence that, once aware of the error, TxDOT stripped Reilly of the promotion and posted the job opening competitively, filling the position in 1999 with an Hispanic male. (Docket Entry No. 26, Ex. 3). Hamilton does not challenge this 1999 decision.

Hamilton has failed to provide any evidence from which a rational jury could infer that TxDOT discriminated against him by promoting Reilly in 1997. Hamilton received yearly recommendations for promotions and pay raises from Ezzell, the same individual who allegedly discriminated against Hamilton on the basis of race. Hamilton does not dispute that Reilly, the individual Ezzell chose to promote over Hamilton, was qualified. Hamilton's arguments are that he believed that he was Reilly's supervisor and that Reilly lacked Hamilton's academic qualifications, while Hamilton lacked Reilly's years of experience. The issue is not whether a rational jury could decide that Ezzell made an erroneous decision. *See Young v. Houston Lighting & Power Co.,* 11 F.Supp.2d 921, 926 (S.D.Tex.1998). The issue is whether a rational jury could find that Ezzell's choice of Reilly for the promotion discriminated against Hamilton on the basis of his race. This court finds no basis for such a finding in the summary judgment record. *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097.

TxDOT's motion for summary judgment as to Hamilton's race discrimination claim based on the 1997 promotion decision is GRANTED.

■ Hamilton also bases his racial discrimination and harassment claim, in part,

on his allegation that his work was reinspected. Hamilton alleges that the reinspections did not occur before November 1997, when Ezzell said that he no longer trusted Hamilton's work. (*Id.*). In his affidavit, Ezzell stated that each employee's work was reinspected, due in large part to TxDOT's fear of liability for any mistakes. (Docket Entry No. 26, Ex. 2). Hamilton does not allege, or point to summary judgment evidence, indicating that Ezzell did not reinspect the work of non-black employees. Hamilton's only allegation is that he was treated differently before and after November 1997, not that Ezzell treated Hamilton's work differently from the work of non-black employees. Moreover, the summary judgment record shows that Ezzell believed that after the November 1997 meeting, Hamilton's work deteriorated, as reflected in the performance evaluations. Such a belief is a legitimate, nondiscriminatory basis for more frequent reinspection.

Hamilton also alleges that the lower performance evaluations he received were a pretext for discrimination on the basis of race. Hamilton bases this argument in large part on his assertion that the 1998 performance review was the first performance review in which he did not receive a rating of "Exceeds Requirements." (Docket Entry No. 27). The summary judgment evidence does not support Hamilton's argument. In 1995, Hamilton received a rating of "Meets Requirements," the same rating he received in 1998. (Docket Entry No. 26, Ex. 1). Hamilton does not acknowledge or address the 1995 "Meets Requirements" evaluation.

Hamilton has failed to produce or point to any summary judgment evidence, other than his own subjective belief, that his race played any part in the employment decisions he challenges, either as disparate treatment or as a racially hostile work environment.[3] Hamilton has provided no summary judgment evidence, apart from his own subjective belief, that he was treated differently on the basis of his race. TxDOT's motion for summary judgment as to Hamilton's claims of racial discrimination and harassment is GRANTED.

## B. The Retaliation Claim

■ TxDOT disputes that Hamilton suffered an ultimate employment action and that there was a causal connection between the employment actions Hamilton challenges and his protected activity. The parties agree that Hamilton engaged in protected activity.

The Fifth Circuit has made it clear that the antiretaliation provision of "Title VII was only designed to address 'ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'" *Burger v. Central Apartment Management, Inc.*, 168 F.3d 875, 878 (5th Cir.1999) (quoting *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997)); *see also Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995)

3. Comparing the conduct Hamilton alleges to the conduct involved in *Walker v. Thompson*, 214 F.3d 615 (5th Cir.2000), in which the Fifth Circuit found that there was a genuine issue of fact material to determining whether the plaintiffs had been subject to harassment, is instructive. The Fifth Circuit found that over a period of three years, the plaintiffs were subject to comparisons with monkeys and slaves; their supervisors made derogatory comments about their African heritage and appearance; and their supervisors used and tolerated the use of patently offensive racial slurs. *Id.* at 626. The plaintiffs' supervisor also explicitly stated that she did not want African–American employees to talk to each other. *Id.* No such allegations or evidence of a racially hostile environment are present here.

(per curiam). " 'Ultimate employment decisions' include acts 'such as hiring, granting leave, discharging, promoting, and compensating.' " *Mattern,* 104 F.3d at 707 (quoting *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981)).

Hamilton stated in his deposition that after he filed his EEOC charges, he was "harassed and subjected to an unfair degree of scrutiny" by his supervisors. (Docket Entry No. 27, Ex. 42, p. 21). Hamilton also stated that his supervisors selectively enforced workplace rules against him; unfairly assigned him duties in a retaliatory manner; placed unjustified critical remarks in his file; and "slandered" him on his evaluation forms. (*Id.*). Hamilton stated that Wegmann "intentionally overburdened [him] with several new projects and stripped [him] of [his] job functions." (*Id.*). Hamilton also stated that he was assigned tasks normally assigned to technicians, not engineers. (*Id.*).

Several of the employment actions Hamilton alleges are clearly not ultimate employment actions. Work assignments, such as Hamilton's claims that he was overburdened; that he was humiliated by being asked to complete computer graphics;[4] and that he was excluded from meetings and projects, are administrative decisions, not ultimate employment actions. *Wayne v. The Dallas Morning News,* 78 F.Supp.2d 571, 584 (N.D.Tex.1999) ("Changing an employee's work schedule, hours, or increasing an employee's workload are merely administrative decisions and do not constitute the type of ultimate employment decisions contemplated by Title VII.") (citing *Benningfield v. City of*

*Houston,* 157 F.3d 369, 377 (5th Cir.1998)). Similarly, the Fifth Circuit is clear that oral reprimands[5] and poor evaluations do not, in themselves, constitute ultimate employment actions. *See Walker,* 214 F.3d at 629; *Benningfield,* 157 F.3d at 377; *Jeffery v. Dallas County Medical Examiner,* 37 F.Supp.2d 525, 530 (N.D.Tex.1999). Nor does Hamilton's claim that he was subject to heightened performance scrutiny allege an ultimate employment action. *See Watts v. The Kroger Co.,* 170 F.3d 505 (5th Cir.1999).

Hamilton also bases his claim on two written reprimands; changes in job responsibilities; and deprivation of a state incentive program bonus. The Fifth Circuit has stated that formal reprimands may constitute ultimate employment actions. *Benningfield,* 157 F.3d at 377; *but see Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 407 n. 8 (5th Cir.1999) (formal reprimands are not ultimate employment actions). The Fifth Circuit looks to whether the challenged employment action "rise[s] above having mere tangential effect on a possible future ultimate employment decision." *Mattern,* 104 F.3d at 708. In this case, Hamilton has provided no summary judgment evidence indicating that the two written reprimands he received on July 20, 1998, have had, or will have, more than a tangential impact on a possible future ultimate employment action. *Cf. Wayne,* 78 F.Supp.2d at 584 (assessing whether allegedly rigged assignment of projects directly impacted plaintiff's compensation). The summary judgment evidence indicates that Hamilton applied for promotion in 1999; however,

---

**4.** Hamilton also alludes to a denial of training on the computer graphics software. Assuming TxDOT did not provide Hamilton training, that does not constitute an ultimate employment action. *See Dollis,* 77 F.3d at 782.

**5.** Hamilton also alleges that Wegmann and Ezzell unfairly blamed him for a physical confrontation Hamilton and Reilly had. (*Id.*). Wegmann orally disciplined both Reilly and Hamilton. (*Id.*). An oral reprimand is not an ultimate employment action.

Hamilton does not challenge his failure to obtain this promotion as discriminatory or retaliatory.

Hamilton alleges that Wegmann and Ezzell "stripped" him of job responsibilities in retaliation for his protected activity. The summary judgment record is not clear as to the job responsibilities Hamilton references. Nor does Hamilton indicate when this occurred. A demotion is an ultimate employment action. *See, e.g., Mattern,* 104 F.3d at 707. In this case, however, the summary judgment evidence indicates that although Hamilton alludes to having been "stripped" of a job title in the reorganization, that occurred in November 1997, before Hamilton engaged in any protected activity. Although Hamilton alleges generally that he was stripped of job responsibilities, he does not allege any facts, or point to any summary judgment evidence, indicating which responsibilities, if any, he had before he engaged in protected activity that he no longer had after he engaged in protected activity.

 Hamilton also claims that, in retaliation for his protected activities, Wegmann wrongfully denied him a bonus provided through the State's Employee Incentive Program. (Docket Entry No. 27, Ex. 40). The Employee Incentive Program provides an opportunity for employees who make suggestions that increase productivity, reduce State expenditures, increase State revenues, or improve the quality of service provided by TxDOT, to receive cash awards or certificates of appreciation. (*Id.*). Hamilton alleges that he made a suggestion that made him eligible to receive a bonus of "more than $5,000.00." (Docket Entry No. 27, Ex. 42, p. 19). On May 17, 1999, Manuel Torres, the Manager of the Continuous Improvement Branch, Human Resources Division, for the State Employee Incentive Program, sent a memorandum to Gary K. Trietch, District Engi-

neer for the Houston District, seeking verification that Hamilton's suggestion had been implemented in the Houston District. Hamilton alleges that after Trietch forwarded Torres's inquiry to Wegmann, Wegmann "prepared a deceptive memorandum ... calculated to cause [him] embarrassment and to insure [he] did not receive the recognition and applicable bonus." (Docket Entry No. 27, Exs. 37, 42, p. 20). Wegmann's memorandum is not part of the summary judgment record. According to Hamilton, in this memorandum, Wegmann stated that the Houston District did not undertake any planned sign replacement or implementation as a direct result of Hamilton's suggestion. (Docket Entry No. 27, Ex. 37).

The summary judgment evidence does not support Hamilton's argument that Wegmann prevented him from receiving over $5,000.00 that Hamilton otherwise would have received. By its terms, the employee incentive program limits cash awards to $5,000.00, but does not guarantee any amount. (Docket Entry No. 27, Ex. 40). In addition, the summary judgment evidence does not support Hamilton's argument. The summary judgment evidence shows that Hamilton did not follow the proper procedure for submitting his proposal. Hamilton admitted to the EEOC investigator that he did not seek Wegmann's approval before sending his suggestion to Austin and admitted that he should have written "sample" across the memorandum. (Docket Entry No. 27, Ex. 24). The summary judgment record provides no evidence, other than Hamilton's unsubstantiated assertion, that Wegmann ever approved or implemented Hamilton's suggestion.

Hamilton has failed to provide evidence that he would have qualified for a State incentive program cash award in the absence of Wegmann's memorandum, which is not part of the summary judgment rec-

ord. The summary judgment evidence indicates that Hamilton's suggestion was not implemented outside of the Houston District and that the Houston District denies having implemented the program at Hamilton's suggestion. (Docket Entry No. 27, Exs. 35–40). It is unclear that a failure to consider an individual for an incentive program is an ultimate employment action. *See Mattern,* 104 F.3d at 708 (missed pay increase is not an ultimate employment action). Even assuming, for the purpose of this summary judgment motion, that Hamilton's failure to receive the cash award did constitute an ultimate employment action, Hamilton does not point to any evidence indicating a causal connection between his protected activity and the challenged employment action. Hamilton does not allege that Wegmann made the final decision to prevent him from receiving a cash award. The inquiry from Torres, on which Hamilton relies, indicates that Hamilton's application for a cash award had already been denied and that Hamilton was pursuing an appeal of that denial. Hamilton does not allege that Torres, or any other final decisionmaker, had any knowledge of his protected activity. Without some indication that the decisionmaker was aware of the protected activity, Hamilton cannot raise a fact issue as to a causal connection. *Cabrol v. Town of Youngsville,* 106 F.3d 101 (5th Cir.1997).

TxDOT's motion for summary judgment as to Hamilton's claim of retaliation is GRANTED.

## IV. Conclusion

TxDOT's motion for summary judgment as to Hamilton's claims is GRANTED. This case will be dismissed by separate order.