**Lottie McMILLAN, Plaintiff-Appellant,**

v.

**RUST COLLEGE, INC.,
Defendant-Appellee.**

No. 82–4277.

United States Court of Appeals,
Fifth Circuit.

Aug. 1, 1983.

David O. Bell, David G. Hill, Oxford, Miss., for plaintiff-appellant.

Eugene D. Brown, Jr., Holly Springs, Miss., for defendant-appellee.

Before RUBIN and JOLLY, Circuit Judges, and PUTNAM *, District Judge.

E. GRADY JOLLY, Circuit Judge:

This appeal is taken from a decision and judgment of the district court in favor of Rust College, Inc.[1], ("Rust"), exonerating it in an action brought under Title VII of the Civil Rights Act of 1964 for sex and retaliatory employment discrimination. Appellant, Lottie McMillan ("Ms. McMillan"), who was formerly employed by Rust, claims discrimination in loss of job positions because of sex and finally discharge in retaliation for filing EEOC charges and this federal law suit.

After hearing testimony, the district court found that Rust had not discriminated against Ms. McMillan because of her sex.

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. Rust College, Inc., is a non-profit corporation domiciled in Holly Springs, Mississippi. It operates Rust College, a private, four-year liberal arts college, affiliated with the United Methodist Church, which serves a predominantly black student body of less than one thousand students.

It further found that Rust had not retaliated against her in violation of Title VII by terminating her employment. On appeal, Ms. McMillan asks us to reverse the district court's finding of no retaliation. She does not appeal the adverse findings of the district court on her claims of sex discrimination. Because she has failed to convince us that the district court clearly erred in any of its subsidiary findings or its ultimate finding that her termination was not the result of unlawful retaliation, we affirm.

### I.

Ms. McMillan is the wife of James C. McMillan, who was the Dean of Students at Rust College. James C. McMillan is the nephew of W.F. McMillan who was and is now President of Rust College.

Ms. McMillan, who received a Bachelor of Science degree from Rust College in 1971, had been employed, beginning in 1972, in various positions at Rust College. At the beginning of the 1979–80 academic year, Ms. McMillan was named Assistant Director of the college's Division of Continuing Education. Eddie L. Smith, Jr., was appointed to be the Division Director. During that academic year, the Division of Continuing Education was restructured. Mr. Smith was assigned to the position of Director of Institutional Research and Federal Relations. Smith's former job was abolished and Ms. McMillan was appointed Coordinator of Continuing Education. Feeling that this position was a downgrade from the eliminated director's position to which she had expected to be named and that the reason for the downgrading was her sex, Ms. McMillan filed a charge of sex discrimination with the EEOC on May 13, 1980.[2]

On July 3, 1980, President McMillan wrote a letter to James McMillan in which he evinced considerable displeasure at the fact that a charge had been filed against the college by Ms. McMillan. He also expressed consternation at the fact that James McMillan would allow his wife to hurt the college and implied that he was being disloyal by doing so.

During the 1980–81 academic year, Ms. McMillan served as the Coordinator of Continuing Education. Because she felt that the college was denying her certain benefits and privileges for having filed the EEOC charge, Ms. McMillan filed another EEOC charge on December 15, 1980, alleging retaliation.

On February 9, 1981, Ms. McMillan was informed that her position of Coordinator of Continuing Education was being eliminated at the end of the current academic year. According to President McMillan, this change was to be made because the college's executive council, based on the need for budget cuts and avoiding duplication, felt that the Division of Continuing Education should be merged into the college's four major divisions. The Institutional Testing and Counseling position, and the position of Assistant Director of Institutional Research and Federal Relations were also eliminated.

By a letter dated February 16, 1981, from President McMillan, Ms. McMillan was informed that she would be offered a teaching position in the Division of Social and Behavioral Sciences. Ms. McMillan was advised that she should contact Dr. T.E. McKinney, the Academic Dean, in order to discuss her specific courses and assignments. (*See Appendix A.*)

On February 17, 1981, Ms. McMillan met with Dr. McKinney in his office. Dr. McKinney advised Ms. McMillan that she would receive a teaching assignment, at which point Ms. McMillan protested that working as a teacher would be demeaning and beneath her dignity, and commenced to voice her general dissatisfaction about the manner in which the college had treated her. With no agreement reached and with tempers rising, Dr. McKinney stopped the meeting and asked Ms. McMillan to leave so that he could dictate some letters about personnel matters to his secretary. Ms. McMillan refused to do so. To avoid a confrontation, Dr. McKinney left his own

---

**2.** On December 22, 1980, the EEOC, after investigating this charge, found that there was no probable cause to believe that Ms. McMillan had been discriminated against because of her sex.

office and went to President McMillan's office, apparently on other business. Unable to speak to President McMillan at that time, however, Dr. McKinney began to leave the president's office. As he was leaving, he was approached by an irate Ms. McMillan in the hallway who struck his left wrist with a hard object as he attempted to get away from her. Dr. McKinney then told Ms. McMillan that she must be "crazy" and left the building.[3]

Ms. McMillan then went to see President McMillan and partially informed him about her meeting with Dr. McKinney, telling him that Dr. McKinney had asked her to leave his office but that she had refused to do so. President McMillan advised her that her appointment to a teaching position would be dependent upon a recommendation by Dr. McKinney and that it would be prudent to apologize for her conduct. Later that afternoon, he was informed by Dr. McKinney that he could no longer recommend Ms. McMillan for employment at Rust.

After her conversation with President McMillan, Ms. McMillan wrote a letter to President McMillan accepting a teaching position in the Division of Social and Behavioral Sciences.

In a February 19, 1981, letter President McMillan, acknowledging receipt of her letter, reminded Ms. McMillan that the teaching position was dependent upon Dr. McKinney's recommendation and suggested that an apology might increase her chances of obtaining the needed recommendation. More than one month later, on March 26, 1981, Ms. McMillan wrote a letter of apology to Dr. McKinney.

Also on March 26, 1981, Ms. McMillan filed this Title VII suit in federal district court against the college. By a letter dated April 3, 1981, Dr. McKinney informed Ms. McMillan that he would not recommend her for a teaching position. On April 20, 1981, he prepared a formal evaluation in which he recommended the termination of her employment.

Between April 3, 1981, and the expiration of her contract on June 30, 1981, Ms. McMillan applied for four non-teaching positions at the college: Job Developer; Director of Cooperative Education; Director of Recruitment and Admissions; and Director of Specialty Services (TRIO). The first two positions were subject to Dr. McKinney's supervision and he recommended two other individuals for these jobs. The Director of Specialty Services (TRIO) position was subject to the supervision of her husband, James McMillan. Because this was a federally funded position, a federal policy against nepotism prevented Ms. McMillan from receiving this position. The Director of Recruitment and Admissions position was also subject to James McMillan's supervision. Mr. McMillan did not recommend his wife for this position because he was under a misunderstanding that the college had a policy against nepotism. His misunderstanding about the college's policy did not result from any actions by college officials.[4]

At the request of Ms. McMillan, President McMillan, in a letter of June 23, 1981, set forth the reasons for the college's failure to reappoint her to a faculty position. He stated, among several other reasons, that she had "contumaciously rejected" Dr. McKinney's offer of a teaching position and because of her "contumacious behavior" in doing so, she was not recommended for reappointment. A footnote to the letter stated: "For documentary evidence of this charge of contumacious behavior see 'Lottie McMillan vs. Rust College, Inc.', Civil Action File # WC81–38–OS–P entitled Summons in a Civil Action, U.S. District Court for the Northern District of Mississippi Western Division dated March 27, 1981." (*See Appendix B.*)

After a three-day trial, the district court held for the college and dismissed the complaint. Ms. McMillan appeals and primarily contends that Rust's asserted reasons for the employment actions which ultimately led to and include her termination in retali-

---

**3.** The account cited herein is Dr. McKinney's version of the incidents of February 17 which was credited by the district court. After reviewing the record, we are satisfied that the district court's findings of fact regarding the incidents are not clearly erroneous.

**4.** *See* n. 7, *infra.*

ation for filing EEOC charges and suing the college were mere pretext.[5]

■ At the beginning, we note that our standard of review of the findings of fact of this Title VII case is the "clearly erroneous" standard. This is true regardless of whether the finding at issue is one of subsidiary fact or the final fact that there was no retaliation. *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 1787–91, 72 L.Ed.2d 66 (1982); *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98 (5th Cir.1982).

Section 704(a) of Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [that employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e–3(a). The order and allocation of proof for Title VII cases set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and clarified in *Burdine v. Texas Department of Community Affairs,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), is applicable to actions for unlawful retaliation under Section 704(a). *De Anda v. St. Joseph Hospital,* 671 F.2d 850, 856 (5th Cir.1982).

■ Applying these standards to a retaliation case, the plaintiff must first establish a prima facie case of retaliation by showing (1) that she engaged in an activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in the protected activity and the adverse employment decision. Once the prima facie case is established, the burden of producing some nondiscriminatory reason falls upon the defendant. *De Anda,* 671 F.2d at 856. The employee then assumes the burden of showing that the reasons given were a pretext for retaliation. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. When, however, the essential facts asserted by each of the parties are not in dispute,

the final shifting to the plaintiff may be expressed more appropriately as one of showing that "but for" the protected activity, the termination would not have occurred, notwithstanding the other reasons advanced by the defendant. *De Anda,* 671 F.2d at 857, n. 12.

There is no doubt, of course, that Ms. McMillan satisfied the showing of protected activity and of adverse employment decision. In attempting to show a causal connection between her termination and her protected activity, she relied upon pejorative comments in the letter of July 3, 1980, sent by President McMillan to her husband concerning her EEOC charge against the college. She also relied upon the letter of July 23, 1981, in which President McMillan listed the reasons her employment was terminated and added the footnote that her lawsuit was reflective of her "contumacious behavior." We hold that this evidence was sufficient to establish the causal connection necessary for a prima facie case. Rust, however, challenged causation by introducing evidence of other cause for each of the employment actions it took: her position of Coordinator of Continuing Education was eliminated because of budget cuts; she was denied a faculty position and contract renewal because of her conduct toward Dr. McKinney; that same reason prevented consideration of her application for two of the other four jobs in question; and the rules against nepotism, one correctly and one incorrectly understood, prevented consideration of her applications for the other two jobs.

Because Rust challenged causation by introducing this evidence, the burden on Ms. McMillan to establish her case is a showing that "but for" the protected activity no action would have taken place. *See McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976); *De Anda,* 671 F.2d at 857, n. 12.[6]

■ In the present case, we believe that Ms. McMillan failed to establish that absent

---

5. As noted earlier, Ms. McMillan has abandoned her claims regarding sex discrimination.

6. While our case here is not a "mixed motive" case for essentially the reason that the district court did not make a finding to that effect (and

retaliation her employment would not have been terminated.

The first action taken by the college after she filed her EEOC charges was to eliminate the position of Coordinator of Continuing Education. In the face of a $400,000 reduction in the school's budget, it is certainly tenable that services which could be so modified had to be assumed by the college's four major divisions. Other positions were also eliminated. No plausible evidence was offered by the plaintiff to show why the decision to eliminate each of the positions, including hers, was untenable. Accordingly, the district court found that the elimination of Ms. McMillan's position was related to legitimate institutional needs. Its finding was not clearly erroneous. On the basis of the record before us, it is evident that Ms. McMillan's position would have been eliminated had she not engaged in protected activities.

With regard to the teaching position in the Division of Social and Behavioral Sciences which had been Ms. McMillan's for the asking, it is obvious that the altercations which Ms. McMillan had with Dr. McKinney impaired beyond repair any possible chance of their having a successful working relationship. Once she had engaged in such serious misconduct toward Dr. McKinney, it simply cannot be said that he would have recommended her for that teaching position, which he supervised, but for her participation in protected activities. As the district court found, it was her rash and intemperate conduct that cost her the teaching position, not the EEOC charges or the law suit.

For these same reasons, it cannot be said that Ms. McMillan would have received either the position of Job Developer or the position of Director of Cooperative Education but for her participation in protected activities. These positions, like the teaching position, were supervised by Dr. McKinney and after the February 17 incident, he could not be expected to recommend Ms. McMillan for any job answerable to him and for which he was responsible.

The Director of Special Programs (TRIO) position, supervised by James McMillan, was part of a program sponsored by the federal government in which nepotism was prohibited. Consequently, Ms. McMillan, as wife of James McMillan, could not have received this position irrespective of her participation in protected activities. The last position, that of Director of Recruitment and Admissions, was also supervised by James McMillan. Because her husband, according to his testimony, was under the mistaken belief that the college had a policy against nepotism which prohibited his wife's appointment,[7] he recommended someone else for the post. Again, it cannot be said that Ms. McMillan would have been appointed as Director of Recruitment and Admissions but for her participation in protected activities.

In conclusion, under the circumstances presented, Ms. McMillan failed to demon-

---

was not clearly erroneous), the claims and facts asserted here are closely akin. We are fully aware, of course, that the United States Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), dealt with "mixed motive" discharges where *constitutionally* protected conduct was involved. In such cases the initial burden is on the plaintiff to show that the protected conduct was a substantial motive behind the termination. The burden then shifts to the defendant who, in order to prevail, must show that the termination would have occurred in the absence of the protected activity. Thus, the final burden under *Mt. Healthy* is on the defendant to exonerate itself, while in Title VII cases the final burden is on the plaintiff to prove the defendant's unlawful motive under the "but for" test.

The *Mt. Healthy* analysis has never been applied to Title VII cases in this circuit. Here it is both inappropriate and unnecessary to decide its application *vel non:* inappropriate because we do not, in fact, have a mixed motive case; unnecessary because irrespective of where the burden lies, the defendant would prevail under either analysis.

7. James McMillan testified that President McMillan told him that a college policy against nepotism prevented his wife from being hired for this position. Dr. McMillan denied this. The district court implicitly found that James McMillan's belief about the nepotism policy was not engendered by Dr. McMillan as part of a retaliatory scheme. Its finding in this regard was not clearly erroneous.

strate that her employment would have been continued but for her filing EEOC charges and the subsequent law suit. As a result, we believe that the district court's finding was not clearly erroneous.

### III.

 Ms. McMillan, referring to the February 16, 1981, letter from the college advising her that it was prepared to offer her a teaching position, contends that her letter of February 17, 1981, accepting a teaching position constituted a binding contract of employment with Rust. Ms. McMillan's contention disregards the fact that President McMillan had earlier, on February 17, before she had written the letter of acceptance, told her that any offer of the teaching position was dependent upon Dr. McKinney's recommendation and that she should apologize for her conduct in order to attempt to get his recommendation. She could not simply create an employment contract by treating the college's letter of February 16 as an unconditional offer of employment in the light of the intervening circumstances which she had created. In reality, the offer of employment was contingent upon Dr. McKinney's recommendation. Her conduct of February 17 precluded the making of such an offer and, therefore, the district court's finding that Rust and Ms. McMillan never entered into any contract was not clearly erroneous.

For the above and foregoing reasons, the decision of the district court is

AFFIRMED.

APPENDIX A

MEMBER

FOUNDED 1944

OFFICE OF THE PRESIDENT
W. A. McMillan, President

## RUST COLLEGE
#### HOLLY SPRINGS, MISSISSIPPI 38635

February 16, 1981

Mrs. Lottie McMillan
Rust College
Holly Springs, Mississippi 38635

Dear Mrs. McMillan:

By now you have received the memorandum to faculty and staff concerning reorganization of several areas of the college for the 1981-82 school year. I thought it best to inform you in writing of how a portion of this reorganization may affect you.

Beginning with the school year 1981-82, it was the unanimous decision of the Executive Council that we fully intergrate Continuing Education into the four major divisions. This decision is based on the need for budget cuts and to avoid duplication.

In view of the service that you have given to the college and your qualification as a faculty member, Dr. McKinney has informed me that he can offer you a position in the Division of Social and Behavioral Sciences as a teacher. The specific courses and assignments will be worked out by you and him if you accept. This will be a <u>nine</u> months contract position and you will have all of the privileges of a faculty member including tenure when you are qualified for same.

In order that we may make adequate preparation for the 1981-82 school year, we will need to have your reaction to this offer within 30 days from

the date of this letter. Failure to respond within this period will cause us to advertise the position in the usual manner.

Sincerely yours,

W. A. McMillan
President

PLAINTIFF'S EXHIBIT
16
2WC8138

WAM:wt

cc: Executive Council

*McMILLAN #1*
*9-10-81*
*WES*

OFFICERS OF THE BOARD OF TRUSTEES

| Dr Merl n D. Conway Chairman | Dr James A. P unct Vice Chairman | Dr F Allen Cauru Secretary | Mr R Bi n I Ley Treasurer |
|---|---|---|---|

## APPENDIX B

## STATEMENT OF CAUSE FOR NON–RE-APPOINTMENT OF MRS. LOTTIE TUCKER MCMILLAN

1. The reason for non-recommendation of Mrs. Lottie McMillan in her present position as Coordinator of Continuing Education is based on financial exigency of The College which has made necessary reorganization of the instructional program and realignment of administrative personnel at The College.

2. Mrs. McMillan contumaciously rejected the offer of the Academic Dean and the Division of Social and Behavioral Sciences Chairperson to be recommended for a teaching position on the grounds that she did not want to teach, that she considers a faculty position demeaning as carrying less prestige than her current position, and that she felt that these efforts of the Dean and Division of Social and Behavioral Sciences Chairperson constituted "harrassment, slander and verbal abuse" directed against her.[1]

3. As a result of The College's decision to reduce its administrative staff by 30%, the only academic positions likely to be vacant for the 1981 Fall Semester are faculty teaching positions.

4. In view of the fact that Mrs. Lottie McMillan has refused contumaciously the Academic Dean's offer of a teaching position on February 18, 1981 and in light of her contumacious behavior on that occasion, she has not been recommended for reappointment.

5. The contumacious behavior set forth in this statement includes conduct which involves:
 a. constantly resisting authority,
 b. not submitting to authority,
 c. insubordination,
 d. disobedient—refusal to obey regulations and failure to follow commands,
 e. being unreasonably determined to have her own way,
 f. not yielding to reason or plea,
 g. acting in a stubborn, dogged, and mulish manner,
 h. resisting remedy or treatment,
 i. being stubbornly persistent in her behavior,
 j. not being easily subdued or capable of ending her pattern of contumacious behavior,
 k. engaging in incomplete disclosure of information,
 l. distortion of facts and twisting interpretation of events in speech, letters and correspondence,
 m. presumptuous behavior in insisting on using travel funds to cover personal trips for the Headstart State Forum, participation in court hearings and meetings other than those

1. For documentary evidence of this charge of contumacious behavior see "Lottie McMillan vs Rust College, Inc.", Civil Action File # WC81-38–OS–P entitled Summons in a Civil Action, US District Court for the Northern District of Mississippi Western Division dated March 27, 1981.

for which approval can be justified for the expenditure of college funds,

n. the omission, failure, or refusal to follow the standard operating procedure practices and regulations of the college concerning absences, travel and acceptance of assignments,

o. putting dishonor and dignity in social relations that should be ruled by friendship and fairness,

p. impropriety of name calling and attacks on supervisor, The College and programs attributed to moral defects,

q. motivations of hatred, anger and envy which have generated words, actions and letters having the effect of dishonoring The College, its programs, personnel and even the program which she presently directs,

r. willful disregard and disobedient of practices, customs, policies, rules, regulations and procedures set forth by The College and enforced by its administrative officials and supervisors,

s. actions calculated to embarrass, hinder, obstruct normal and routine operations of The College,

t. the writing and transmission of letters calculated to lessen the authority and dignity of The College, its program and supervisory officials,

u. willful disobedience to supervisors, rules, procedures and regulations in contraventions of college authority and dignity,

v. contentious refusal to carry out instructions, and

w. contentious face-to-face detractions and back biting attitudes in dealing with colleagues, supervisors and superiors.

6. These acts of contumacious behavior are amply documented in letters, absence forms, travel request and travel report forms, memoranda and correspondence conducted between Mrs. McMillan, the President of Rust College and other officials of The College dating from July 3, 1980 through May 29, 1981.