Marilyn **BROWN**

v.

**LOUISIANA LOTTERY CORPORATION**

No. CIV.A.01–282.

United States District Court, M.D. Louisiana.

Nov. 4, 2002.

---

J. Arthur Smith, III, Baton Rouge, LA, Gregory Ashby Toney, Law Office of J. Arthur Smith, III, Baton Rouge, LA, for Marilyn Brown, plaintiff.

Thomas Harry Kiggans, Phelps, Dunbar, LLP, Baton Rouge, LA, for Louisiana Lottery Corporation, defendant.

### *RULING & ORDER*

BRADY, District Judge.

This matter is before the Court on a motion for summary judgment (doc. 18) filed by the defendant, Louisiana Lottery Corporation, pursuant to Federal Rule of Civil Procedure 56(c). The parties have briefed the matter. The Court did not require oral argument. Plaintiff, Marilyn Brown, asserts her claims under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* Specifically, she asserts a § 2000e–3(a) claim for retaliatory discharge. Consequently, this Court has federal question jurisdiction under 28 U.S.C. § 1331. The Court finds that the plaintiff has presented a genuine question of material fact and denies the motion.

### FACTUAL BACKGROUND

The facts of this case are relatively simple. Complexity enters only because there are three versions of the story.

According to Plaintiff, Marilyn Brown, and Troylynn Balancier (now Troylynn Stokes), the story begins with a phone call from Balancier to Brown. Brown worked as an Accounts Receivable Manager at the Louisiana Lottery Corporation ("the Lottery"). Balancier had worked servicing gambling machines for G–Tech, a contractor for the Lottery. Balancier called Brown to complain that she had been sexually harassed by Mike Allen, a Regional Manager at the Lottery. Balancier told Brown that she and Allen had carried on a sexual relationship while she worked at G–Tech. Balancier tried to break off the affair after she got back together with her first husband. She told Brown that Allen had gotten her the job at G–Tech and then threatened to get her fired after she stopped seeing him. Consistent with Lottery policy, Brown reported Balancier's story to an employee in the Lottery security department.

Somehow Mike Allen found out that Balancier had spoken to Brown. He called Balancier and threatened to tell her husband that they had a continuing relationship if she filed a formal complaint. He also demanded that she come to the Lottery and tell his employers that Marilyn Brown tried to set him up. Out of fear, Balancier did as she was told. She met with representatives of the Lottery—with Allen escorting her—and told them that Brown had contacted her and tried to get her to make false allegations of sexual harassment against Allen. She produced

an envelope containing a tape-recorder and a note from Brown and told the Lottery people that Brown wanted her to use it to set Allen up. According to Brown, the Lottery used this story as a pretext to fire her immediately. The Lottery in fact terminated her in retaliation for her report against Allen. Alternatively, Brown claims that Allen used his influence with the decision-makers at the Lottery to get her fired. Balancier has subsequently recanted her recantation. She now supports Brown's version of the events.

Allen would present the story quite differently. He denies that there was ever any kind of relationship between himself and Balancier. He denies making any threats. He also denies that there was ever any sexual harassment of any kind. According to Allen, Brown tried to get Balancier to lie for her. When he found out, he got Balancier to agree to clear the air with Lottery officials.

The Lottery is more circumspect about the on-again, off-again allegations of sexual harassment. Its decision-makers now take no position on the matter, except to say that they have no reason to disbelieve the story Balancier told them that day.[1] They maintain only that they were reasonable in believing Balancier's story at the time and reasonable in relying on that story to fire Brown, despite the fact that they made no independent inquiry into the events. They also claim that only one of the three decision-makers who ultimately decided to terminate Brown's employment knew of her harassment report at the time that they made the decision to fire her.

### PROCEDURAL BACKGROUND

Plaintiff Marilyn Brown timely filed suit against the Lottery under 42 U.S.C. § 2000e–3(a), claiming that the Lottery discharged her in retaliation for reporting a case of sexual harassment. Before filing suit, she filed a discrimination charge with the Equal Opportunity Commission, which issued a notice of Right to Sue. Brown alleges that she suffered significant anxiety, depression, and insomnia, as well as injuries resulting therefrom. Treatment of these disorders imposed medical expenses. Brown seeks (1) a declaration from this Court that her employer violated § 2000e–3(a), (2) reinstatement to her former position, (3) backpay, (4) compensatory damages with interest, and (5) attorneys fees, costs and expenses.

Defendant, Louisiana Lottery, has filed a motion for summary judgment seeking complete dismissal. The Lottery claims that Brown cannot establish two essential elements of her claim: (1) that her sexual harassment report was an act protected by Title VII and (2) that she was fired *because of* that report. The Lottery also claims that even if the Court finds that Brown has met her initial burden on the second element, she has not presented any evidence to rebut the Lottery's asserted legitimate, non-discriminatory reason for her termination.

Because Brown asserts her claims under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.,* this Court has federal question jurisdiction under der 28 U.S.C. § 1331.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322,

---

1. Balancier's retraction is, in their view, not any reason at all rather than simply an imper-

fectly trustworthy reason.

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the burden at trial rests on the non-moving party, as it does here, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more elements essential to the non-moving party's case. *Id.*

Although this Court considers the evidence in the light most favorable to the non-moving party, the non-moving party may not merely rest on allegations set forth in the pleadings. Instead, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health,* 102 F.3d 137, 139–40 (5th Cir. 1996). If, once the non-moving party has been given the opportunity to raise a genuine factual issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the moving party. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *see also,* Fed. Rule Civ. P. 56(c).

## ANALYSIS

Courts apply the *McDonnell Douglas Corp. v. Green*[2] burden-shifting framework to Title VII retaliation cases. *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir.1983). The plaintiff carries the initial burden of establishing a *prima facie* case of unlawful retaliation. *Id.* If that effort is successful, the defendant must provide a legitimate, non-retaliatory reason for the adverse employment action. *Id.* If the defendant, too, is successful, then the burden shifts back to the plaintiff, who must produce evidence to show that but for the fact that she took action protected by the statute—part of the *prima facie* case—the employer would not have taken the adverse employment action. *Id.* Faced with a motion for summary judgment, the plaintiff must show that she has presented a genuine issue of material fact on each element of the *prima facie* case. If the defendant has satisfied its burden of providing a legitimate rationale, then the plaintiff must also show that there is a genuine issue of material fact whether defendant would have taken the adverse action but for her participation in the protected activity.

## I. The *Prima Facie* Case

■ Brown brings her claim under 42 U.S.C. § 2000e–3(a), seeking to recover for alleged retaliatory discharge. That section provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). To make out the *prima facie* case for a § 2000e–3(a) claim of retaliation, a plaintiff must show that:

> (1) she engaged in activity protected by Title VII;
>
> (2) she suffered an adverse employment action; and
>
> (3) engaging in the protected activity is causally linked to the adverse employment action.

*Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 705 (5th Cir.1997). Brown claims that she reasonably believed that she was reporting a case of sexual harassment by one

---

**2.** 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824– 25, 36 L.Ed.2d 668 (1973).

of her peers. Had she been correct that the conduct she reported was covered sexual harassment, then it would have been an "unlawful employment practice." Her report would clearly have constituted either opposition to or initiation of (and hence participation in) an investigation of an unlawful employment practice. In that case, her report would uncontroversially have been protected activity under § 2000e–3(a). Brown claims and the Lottery admits that the Lottery fired Brown, which satisfies the second element. *Id.* at 707. Brown also claims that she was fired because she reported the harassment.

### A. Protected Activity

■ The Lottery argues that Brown has failed adequately to support her *prima facie* case. First, it argues that Brown's report was not protected activity and that consequently she has not presented a valid retaliatory discharge claim. It is uncontested that the woman who complained of harassment (Balancier) did not work for the same company as her alleged harasser (Allen) and the reporter (Brown). Instead she worked for a company that serviced the employer's machines. Title VII, says the Lottery, protects only workers within the same workplace. Consequently, Allen's harassment of Balancier was not an unlawful employment practice. Moreover, since § 2000e–3(a) covers only attempts to remedy "unlawful employment practices," Brown's report was not protected and she has no claim under that section.

■ This argument is without merit. An employee's report on an employer's business practice is protected so long as the employee reasonably believes that the employer's conduct is unlawful. *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1140–41 (5th Cir.1981). A typical employee is not schooled in the minutiae of employment discrimination law. It would chill employee whistle-blowers to require that their objections be to practices that are actually covered by Title VII. Because of this policy concern, the Fifth Circuit, in *Payne,* wrote that:

> [W]e are compelled to conclude that a plaintiff can establish a prima facie case of retaliatory discharge under the opposition clause of section 704(a) [2000e–3(a), in its uncodified form] if he shows that he had a reasonable belief that the employer was engaged in unlawful employment practices.

*Payne,* 654 F.2d at 1140. Consequently, Brown's burden is to show that there is a genuine issue whether she reasonably believed that Allen's alleged conduct constituted an unlawful employment practice; it does not matter whether his conduct in fact was such a violation.

Brown has met this burden. Brown's deposition testimony indicates that she initially heard that Allen had gotten a job for Balancier at the Lottery. The deposition includes the following colloquy:

Q: Okay. You said you spoke to Erica. You called Erica back then after Ms. Balancier had called?

A: Yes, I did.

Q: And what was the substance of that conversation?

A: Erica said that she had introduced Troylynn, Ms. Balancier, to Mike Allen, and that Mike Allen had helped her get a job at the Lottery. And I think Erica said that Troylynn and Mike had been fooling around—that was the terminology, I believe—and that Mike tried to get her fired from G–Tech. [...]

Q: Was there anything else that was said in your conversation with Erica Nicholas that day?

A: No, not that I can recall.

Q: So simply that she knew that Ms. Balancier and Mr. Allen had been

fooling around and he had gotten her a job at G–Tech. Anything else?

A: And that he tried to get her fired . . .

Brown dep. at 127–128. Within a single page, Brown has stated that Allen got Balancier a job at the Lottery and at G–Tech. This indicates that the corporate differences that mean so much to corporate officers and directors had little traction in Brown's mind. The Lottery identifies G–Tech as a separate company that services the Lottery's on-line game machines. That they are independent contractors and not a division of the Lottery may not be perfectly obvious to an employee of the Lottery, especially one who has learned that a Lottery supervisor intervened to get someone hired at G–Tech. Moreover, even if Brown understood the corporate distinction, she would not have understood that it carried serious import within the law. She knew that she had a duty to report instances of sexual harassment because that duty was communicated to her by the Lottery. When she found out about Balancier's story, she agonized over whom to contact. Eventually she did report the transgression. In her deposition, Brown stated:

A: I believed her story. Sexual harassment, once again, is offensive. There should never be a place for it in the workplace. Those who commit acts of sexual harassment should be dealt with in some manner, and I think that by her coming forward is a way of encouraging other people who have been harassed to come forward and report these instances.

People like Ms. Balancier, who are frightened for some reason, as she said she was threatened, are usually not quick to come forward with these complaints, and they need to be reported. The law is a good law. It's made for all of us to follow, and I feel

that she was intimidated, she was afraid, and what Mike did was wrong.

Brown dep. at 223–24. This testimony indicates that Brown believed Allen's activities violated the law. Furthermore, the Lottery's own policy statement regarding sexual harassment embodies no requirement that abuser and abused work in the same workplace. It defines sexual harassment as follows:

Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature constitutes sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Exhibit 8, Louisiana Lottery Corporation Personnel Policies and Rules at 2. It is clear that, at least according to Balancier's version of Allen's threat which the Court is compelled at this stage to credit, Allen told Balancier that he would get her fired if she refused to continue their sexual relationship. If one believed he had that power—and Balancier believed that Allen got her the job in the first instance—then one would believe that the threat was an instance of sexual harassment under (2) in the Lottery's policy above.

Both because the Court will not impute lawyerly knowledge of corporate structure or statutory construction and because Brown's testimony is compelling and uncontested, this Court finds that Brown has presented a genuine question on the issue whether she reasonably believed that Allen's alleged conduct constituted an unlaw-

ful employment practice. By so doing, she has presented a genuine question of fact as to whether her report was protected by § 2000e–3(a).

It bears noting as well that Brown has also presented a controversy about what actually transpired between Balancier and Allen. The Lottery claims that the truth about Allen's conduct is irrelevant to the case. Their contention, however, is that they terminated Brown because she lied about the relationship between those two and attempted to set Allen up. Balancier now claims that she spoke to Brown and then changed her story to the Lottery when she came under pressure from Allen. She now claims that Allen did harass her. If a jury credited this version of the events, it would certainly be better able to reject the claim that Brown concocted the story in the first instance. In that event, it would be able to conclude that she reasonably believed Allen committed a violation of the sexual harassment law and further conclude that her actions were protected under the statute.

## B. Adverse Employment Action

■ Brown must also establish that she suffered an adverse employment action. It is uncontested that the Lottery terminated her employment. Even in the Fifth Circuit, where an adverse employment action must be an *ultimate* employment action, termination qualifies. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997). Consequently, Brown has established the second element of her *prima facie* case.

## C. Causation

■ The Lottery also challenges the sufficiency of Brown's evidence that there was a nexus between her report and her termination. To support this contention, the Lottery argues that Brown has presented no evidence that the people who decided to fire Brown even knew about her

sexual harassment report. Relying on precedent from the Fourth Circuit, the Lottery argues that there cannot be the requisite causal connection if the decision-maker (the person who took the adverse employment action) had no knowledge of the protected activity. The Lottery claims that three people were involved in the decision to terminate Brown: Charles Randall Davis, the Lottery President, John Carruth, General Counsel for the Lottery, and Keith Shuford, Senior Vice President of Human Resources for the Lottery. All three agreed that Brown should be terminated after the meeting with Balancier on August 27, 1997. The Lottery terminated Brown on the same day. Davis knew of Brown's earlier report, but according to the Lottery, Shuford and Carruth never knew about it because Davis never informed them. This latter contention is not supported by Shuford's deposition. There he stated that he learned of Brown's report before she was terminated, but that he did not need to investigate the matter and did not need to give Brown an opportunity to respond. Shuford dep. at 16–20. Moreover, Davis authorized the termination and it is admitted that he knew of Brown's earlier report of the same incident. Consequently, the Lottery's contention that the relevant decision-makers never knew of—and so could not be motivated by—Brown's protected activity is without merit. On this issue, too, Brown has presented sufficient evidence to create a triable controversy.

■ In some instances, an employer may be liable for retaliation even if the decision-maker for the employer bears the employee no animus. *See Gee v. Principi*, 289 F.3d 342, 346 (5th Cir.2002); *Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir.1996). Brown argues that even had the relevant decision-makers born her no animus—indeed, even had they not known

of her report—the Lottery can be held liable for retaliation because Allen, who bore her animus, manipulated the decision-makers. In such situations, the fact that the ultimate decision-maker did not act directly out of animus does not cut the causal link between the protected activity and the adverse employment action. The relevant question, according to the Fifth Circuit, is whether "the employee can demonstrate that others had influence or leverage over the official decision-maker." *Gee*, 289 F.3d at 346.

If the Court assumes—as it must at this stage—that Allen did harass Balancier, then there is also a triable question of fact whether Allen manipulated Davis and Shuford and thereby caused Brown's termination. It is uncontested that Allen came to know of Brown's initial report and that Allen convinced Balancier to talk to the people at the Lottery. It follows from these propositions that Allen convinced someone he had harassed to deny that fact and to wrongly accuse Brown of making that story up. If the Court further credits the Lottery's story, then they relied entirely on the story that Allen concocted and terminated Brown based on it without any independent investigation. Lying is objectionable precisely because it elicits actions in others out of reliance on falsehoods—it is manipulative. If the harassment occurred and the Lottery was innocent of all knowledge, then the influence test in *Gee* applies to this case. Consequently, even if the Lottery decision-makers could show that they were completely innocent of all knowledge and animus in making the decision to fire Brown, there would nevertheless be a controversy over the company's liability for Brown's termination.

## II. Rebutting the Legitimate Rationale

Plaintiff also bears the burden of presenting sufficient evidence on the question whether she would have been fired but for her protected activity. In response to her allegation, the Lottery counters that it fired Brown because it believed Balancier's now-withdrawn story that Brown asked her to make false allegations against Allen. Brown must show that there is a triable controversy on this point. She must, in particular, "produce evidence demonstrating that [the Lottery] did not in good faith believe the allegations, but relied on them in a bad faith pretext to" retaliate against her for reporting on Allen. *See Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir.1993). As the Fifth Circuit has written, when the legitimate non-discriminatory reason for termination involves reliance on the word of another person:

> The real issue is whether the employer reasonably believed the [informant] employee's allegation and acted on it in good faith, or to the contrary, the employer did not actually believe the [informant] co-employee's allegation but instead used it as a pretext for an otherwise discriminatory dismissal. Thus, the inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief.

*Id.* at 1165–66. The question presented by this motion for summary judgment, then, devolves into the question whether Brown has presented a genuine issue as to whether the decision-makers at the Lottery reasonably believed that she solicited Balancier to make false allegations against Allen. To meet this burden at the summary judgment stage, Brown must present more than her own subjective conviction that the Lottery did not believe Balancier's story in good faith.

The Court finds that Brown has presented evidence sufficient to create a fact controversy regarding the question whether

the Lottery's reasonably believed Balancier's story. Indeed, she need go no further than the Lottery's Keith Shuford to meet her burden of proof. Mr. Shuford's version of the story is the following: Out of the clear blue sky a stranger walks into an office, accuses a trusted company employee of an outlandish scheme to blame another employee for sexually harassing the stranger, produces evidence in some tension with the story itself, and walks out having succeeded at getting the employee fired without any investigation—all the while accompanied, or perhaps shadowed, by the purported harasser. Shuford claims that he did not know Balancier when the meeting opened.[3] She was not an employee of the Lottery and they had never met. He also claims that they did not know that Brown had already reported Allen's sexual harassment. Shuford claims, in fact, to have been free of almost any background knowledge. Balancier entered the meeting with Allen and told Shuford and the others that Brown had tried to get her to falsely accuse Allen of sexual harassment. She supported this testimonial by producing a "large manila type envelope, that has Marilyn's handwriting on the front ... [a]nd inside of it is a recorder ... and one of those 'while you were out' message type cards." Shuford dep. at 14. Based on these bare assertions alone the Lottery decided to terminate her. They conducted no investigation. They did not confront the subject of the accusation.

If this story is to be credited, it is no wonder decision-makers at the Lottery thought that making false accusations is such serious business. For in the case of the accusations against Brown—now themselves alleged to be false—accusations made by a stranger resulted in Brown's termination without even the courtesy of an investigation. Surely Allen would have received the same treatment had Balancier decided to go through with her complaint.

Other aspects of the Lottery's narrative are suspicious as well. Balancier supported her story by producing an envelope with a tape-recorder. Fortuitously, one of the Lottery decision-makers recognized Marilyn Brown's handwriting on that envelope. No one thought to ask how a tape recorder would help in a scheme to concoct a *false* allegation of sexual harassment. No one, in fact, sought any corroborating evidence whatsoever. It is also troubling that Shuford's story indicates an awareness of Brown's report, despite his denials. Asked why Mike Allen was present, Shuford responded, "He was a participant as far as *he was being blamed for something* he was innocent of, and his is the one that made us aware of the situation." Shuford dep. at 13 (emphasis supplied). The premise of the Lottery's story, of course, is that as far as it knew, no one, including Brown and Balancier, had accused Allen of anything at that point. Instead, the Lottery would have the Court believe that its decision-makers were blissfully ignorant of any

---

3. The cases the Lottery cites to suggest it was entitled to rely on Balancier's story all concern believing accusations by employees, not strangers. This Court chooses to treat this difference as one factor to be considered in weighing the reasonableness of reliance. The Lottery had no experience judging the reliability of Balancier. It would have had considerably more reason to rely on the word of a trusted employee, say Marilyn Brown. The Lottery contends that it had as much reason to believe Balancier as Marilyn Brown did.

In this contention, the Lottery is correct. The distinction between their situations is that Brown had to decide whether to report the alleged incident to a supervisor who could conduct an investigation into its veracity, whereas the Lottery immediately credited Balancier's story without any investigation and relied on it to terminate Brown's employment. It bears noting as well that Brown took two days to decide to report the allegations, whereas the Lottery acted on the same day.

background facts. As far as they were aware, Balancier had terminated Brown's scheme before it came to fruition. Hence, Allen was not being blamed for anything during the meeting.[4] The Court finds Shuford's apparent confusion on this point, together with the facial implausibility of the Lottery's version of the events, sufficient evidence to create a factual controversy as to whether the Lottery based its decision on reasonable good faith reliance on Balancier's story.

■ Brown need do nothing more to carry her burden of showing that the Lottery retaliated against her. Though Brown ultimately must prove pretext *and* retaliation, "a factfinder may infer the ultimate fact of retaliation from the falsity of the explanation." *Gee v. Principi,* 289 F.3d 342, 348 (5th Cir.2002). In such circumstances a plaintiff may survive summary judgment without any independent evidence of retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Gee,* 289 F.3d at 348.

### CONCLUSION

For the foregoing reasons, the Lottery's motion for summary judgment (doc. 18) is **DENIED.**

4. Seemingly, the Lottery's story would have more plausibility if it had admitted that its decision-makers knew of Brown's report at the outset, but came to believe Balancier's version of the events. Under that version, of course, the Lottery would still have to explain why it conducted no investigation and why, given that there was a controversy over the nature of their relationship, it allowed Allen to accompany Balancier into the meeting. These facts, already strange, would seem all the more suspicious if the Lottery decision-makers knew of the earlier complaint.